Requestor: Hon. Salvatore R. Curiale, Superintendent State of New York Insurance Department 160 West Broadway New York, New York 10013-3393
Written by: Robert Abrams, Attorney General
You have asked whether municipalities in New York State may purchase liability insurance from a multi-state "risk retention group" pursuant to Federal Liability Risk Retention Action of 1986 (15 U.S.C. § 3901-3906) ("LRRA") in light of sections 6-n(7) and 99-p of the General Municipal Law and other New York State statutes, which appear to limit the creation and pooling of insurance liability funds by municipalities in the State.
The LRRA and its predecessor, the Product Liability Risk Retention Act of 1981 ("PLRRA"), were responses by Congress to the sudden sharp increases in liability insurance premiums for a wide range of private and public entities and activities in the late 1970s. Among its other provisions, the PLRRA facilitated the formation and operation of risk retention groups, which sought to assume and spread all or part of the product liability or completed operations liability risk exposure of member groups and qualified group purchasers. The provisions of the PLRRA explicitly preempted state laws and regulations that would, inter alia,
"make unlawful, or regulate, directly or indirectly the operation of a risk retention group . . ." (15 U.S.C. § 3902[a][1][1981] [amended 1986]).
Several significant changes were made to the PLRRA by amendments enacted in 1986 (the "Risk Retention Amendments"), and the Act was renamed as the LRRA (Pub L 99-563; 15 U.S.C. § 3901[a][4][C][ii]). These changes included: (1) an expansion of the scope of risk retention group activity from product liability insurance to all types of liability insurance; and (2) an increase in the authority of chartering and non-chartering states to regulate the solvency, trade practices and other aspects of risk retention groups. Yet the LRRA retained the basic preemption guidelines set out in the PLRRA. (Because of the importance of the preemption provisions, they have been set forth in their entirety in Appendix I.)
Among those groups which the PLRRA and LRRA were designed to benefit were municipalities (Pub L 97-45; 1981 US Code Cong and Admin News, p 1432ff).
This does not compel a conclusion, however, that the Act empowers municipalities to participate in multi-state risk retention groups in spite of contrary state regulation. Control over the formation and activities of municipalities has traditionally been a hallmark of state power (Trenton v New Jersey, 262 U.S. 182, 186 [1922]). See also,Whittaker v Franklinville, 265 N.Y. 11, 14 (1934) (state alone has the power to establish a municipal corporation); Markey v Queens County,154 N.Y. 675 (1898) (subject to state constitutional limitations, state oversees the division, addition, or consolidation of municipal boundaries). Municipalities are subject to control of the state legislature in the exercise of their powers (see generally, 56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions, §§ 87-95 [1971], and cases cited). They possess only the authority granted to them by law (Hansel v Long Beach, 61 A.D.2d 84 [2d Dept, 1978]). In general, the Legislature has a high degree of control over the revenues of a municipality derived from taxation, and may impose upon it the performance of duties of a public nature (Darlington v New York,31 N.Y. 164 [1865]).
Moreover, the regulation of insurance, although clearly within the ambit of federal power, has traditionally been left to the control of the states. Both Congress and the courts have been reluctant to displace state regulatory schemes in actual effect (15 U.S.C. § 1011, 1012;Securities and Exchange Commission v Variable Annuity Life InsuranceCompany of America, 359 U.S. 65 [1959]). Indeed, the prime purpose of the McCarren-Ferguson Act of 1945 was to preserve state regulation of the activities of insurance companies (Group Life Health Ins. Co. v RoyalDrug Co., 440 U.S. 205, rehearing den 441 U.S. 917 1979]). Moreover, in the few cases which have measured the preemptive reach of the LRRA to date, that reach has not been held limitless (see, e.g., Insurance Co. ofState. of Pa. v Corcoran, 850 F.2d 88 [2d Cir, 1988] [LRRA did not prohibit application of state policy-form regulation and rate regulation of purchasing groups]).
In light of this judicial tradition, legislative history, and case precedent, congressional intent and legislative language must be scrutinized with particular care to determine whether the LRRA preempts states from limiting participation by their municipalities in risk retention groups.
It is clear from the LRRA's legislative history that Congress intended the Act to empower state and local governments to form risk retention groups for acquisition of liability insurance (see15 U.S.C. § 3901[a][2][A][ii] [definition of "liability" under the Act includes "any activity of any State or local government, or any agency or political subdivision thereof"]; letter of Rudolph Penner, Director, Congressional Budget Office, 1986 US Code Cong and Admin News, p 5307).
It is also clear that Congress contemplated limits to the preemptive power of the Act (House Report, p 20; 1986 US Code Cong and Admin News, p 5317). The 1986 amendments created a new section 3905, which clarified State authority in a variety of areas (see Appendix II). For example, the House version of the bill (HR 5225) added section 6(d) to the 1986 amendments, which later became section 3905(d) of the LRRA, as follows:
 "Subject to the provisions of section 3902(a)(4) of this title relating to discrimination, nothing in this chapter shall be construed to preempt the authority of a State to specify acceptable means of demonstrating financial responsibility where the State has required a demonstration of financial responsibility as a condition for obtaining a license or permit to undertake specified activities. Such means may include or exclude insurance coverage obtained from an admitted insurance company, an excess lines company, a risk retention group, or any other source regardless of whether coverage is obtained directly from an insurance company or through a broker, agent, purchasing group, or any other person."
The plain purpose of the provision is to permit states to continue to demand higher standards of insurance protection for certain types of high-risk activities. This was a response to the fears of certain legislators that the broad terms of the Act would be read to undercut this exercise of police power (see Congressional Record-House, September 23, 1986, H8093; Congressional Record-Senate, July 17, 1986, S9233).
In its original amendment proposal, the House version of the bill (H5225) contained an additional measure, based on a comparable concern. Section 6(e) read as follows:
 "Nothing in this Act shall be construed to preempt the authority of a State to specify acceptable means for managing the liability of the State or its local governments (or any agency or political subdivision thereof). Such means may include or exclude insurance coverage obtained from an admitted insurance company, an excess lines company, a risk retention group, or any other source, or through a broker, agent, purchasing group, or any other person" (Congressional Record — House, September 23, 1986, H8093; see also, House Report [Energy and Commerce Committee] No. 99-865; 1986 U.S. Code Cong and Admin News, pp 5303, 5317).
This language, however, was dropped during joint committee negotiations. In subsequent floor debate on the bill, Senator Kasten, the LRRA's principal sponsor, explained why the latter provision was excised while the former was retained:
 "These same considerations [i.e., respect for state police powers v concerns over discrimination against RRGs] apply with respect to the authority of States to specify acceptable means for managing the liability of the State or its subdivisions. The House bill contained language indicating that this measure does not preempt State authority with respect to the management of the liability of the State or any agency or subdivision of the State. This language has been dropped as unnecessary, because this State authority, as delineated in the House bill, is not affected by this legislation" (remarks of Senator Kasten, Congressional Record — Senate, October 6, 1986, S15452. See also, remarks of Senators Gorton and Kasten, Congressional Record — Senate, July 17, 1986, S9233; emphasis added).
The explanation was repeated in the House shortly thereafter, as it concurred in the deletion of section 6(e). As then Representative Florio observed:
 "On September 23, the House passed H.R. 5225 without objection. Immediately following passage the House took up S. 2129 and amended it with the text of H.R. 5225. Since passage of the House bill, the other body has agreed to accept the House bill with several clarifications and the omission of the part of section 8(c) of the House bill relating to governmental units. This section would have added a new subsection 6(e) to the Product Liability Risk Retention Act of 1981, as amended. I wish to clarify why that provision has been deleted from the bill we are considering today.
 "It has been decided that the provision is unnecessary since there is nothing in the Product Liability Risk Retention Act or the amendments under Consideration that prevents States from doing what the deleted provision said they could do" (remarks of Representative Florio, Congressional Record — House, October 9, 1986, H9695; see also, Representative Lent's remarks, which follow Florio's; emphasis added).
In light of these express declarations, we conclude that Congress did not intend the LRRA to preempt State laws respecting "the management of the liability of the State or any subdivision of the State" (WoodworkManufacturers v NLRB, 386 U.S. 612, 640 [1966]; U.S. v Oates, 560 F.2d 45
[2d Cir, 1977] [sponsor's interpretation of his proposal, prior to the adoption of legislation, is entitled to great weight]).* The answer to your question, then, turns on whether past acts of the New York State Legislature have "specified acceptable means" of municipal liability management which prohibit participation in multi-state risk retention groups.
There are few aspects of state sovereignty more important than the power of the State to preserve the financial integrity of its municipalities (see, e.g., N Y Const, Arts VIII, IX). It is our view that regulation of the insurance practices of municipalities is an important element of this power. Whether the State is or is not ultimately responsible for the uninsured or underinsured liabilities of its subdivisions, it has a strong interest in protecting taxpayers from such liabilities at both the State and local level.
Among the Legislature's recent efforts to manage the liabilities of its political subdivisions through the regulation of the self-insurance practices of its municipalities were the passage of Chapter 684 of the Laws of 1979 and Chapter 220 of the Laws of 1986. By means of these acts, the Legislature established a series of options and restrictions for the creation, management and reciprocal pooling of the insurance liability funds of its municipal subdivisions.
Chapter 684 added section 6-n to the General Municipal Law, explicitly permitting municipalities for the first time to establish a self-insurance fund for losses incurred against or suffered by them. In so doing, it included such conditions as a limitation on the cash balance of the fund and the amounts paid to it in a given year (id., § 6-n[4]), deposit and investment restrictions (id., § 6-n[5]), claims settlement and expenditure restrictions (id., § 6-n[8]-[12]), and others. Under section 6-n(7), the pooling of these funds with those of other municipalities was expressly prohibited.
Chapter 220, enacted several months prior to the LRRA, was intended
 "to alleviate the problems of unaffordability and unavailability of [commercial risk, public entity, and professional liability] insurance, to provide for increased security of rates and rating procedures, and to provide for increased disclosure and knowledge of insurance company financial practices by, among other measures:
. . .
 (c) allowing New York counties, towns, cities, villages, district corporations, school districts and boards of cooperative educational services to organizeand subscribe to statewide municipal reciprocal insurers . . . (L 1986, ch 220, § 1; emphasis added).
It is clear from a reading of chapter 220 that the State Legislature was aware of the problems and benefits of pooled fund limitations and carefully considered the importance of municipal financial integrity in its grant to municipalities of the right to form or join State reciprocals.* In addition to the provision guiding the conduct of all reciprocals, municipal reciprocals are governed by further provisions (e.g., Insurance Law, §§ 6102[b][12], [h] and [j]). These provisions, among others, include any additional standards prescribed by the Superintendent of Insurance; include a prohibition on refusals to issue policies based solely on geographical location; deal with establishment of, promotion of, and required participation in a risk management program among subscribers; modifications of initial surplus requirements to policyholders; and include procedures to prevent conflicts of interests between insurers and their attorney-in-fact.
We believe it is clear that chapter 220 is an authorization for New York municipalities to organize and subscribe to State-wide municipal reciprocals. The plain intent was to form and operate these reciprocals under provisions of New York State law and in accordance with standards prescribed by the State Superintendent of Insurance. In our view, chapter 220 reflects the Legislature's intent to expand carefully and narrowly the self-insurance funding powers granted under chapter 684, under sharply constrained conditions, a higher standard of protection, and the watchful regulatory eye of the Department of Insurance.
In conclusion, we believe that State law excludes participation by New York municipal corporations — including counties, towns, cities, villages, district corporations, special improvement districts, school districts and boards of cooperative educational services — in interstate reciprocals or risk retention groups.
 APPENDIX I Preemption Provisions of the Liability Risk Retention Act
15 U.S.C. § 3902(a) and (b)(1981), as amended by Risk Retention Amendments of 1986, Pub L No. 79-563, § 5, 100 Stat 3172, read as follows:
 "(a) Exemptions from State laws, rules, regulations, or orders
 "Except as provided in this section, a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would —
 "(1) make unlawful, or regulate, directly or indirectly, the operation of a risk retention group except that the jurisdiction in which it is chartered may regulate the formation and operation of such a group and any State may require such a group to —
 "(A) comply with the unfair claim settlement practices law of the State;
 "(B) pay, on a nondiscriminatory basis, applicable premium and other taxes which are levied on admitted insurers and surplus lines insurers, brokers, or policy holders under the laws of the State;
 "(C) participate, on a nondiscriminatory basis, in any mechanism established or authorized under the law of the State for the equitable apportionment among insurers of liability insurance losses and expenses incurred on policies written through such mechanism;
 "(D) register with and designate the State insurance commissioner as its agent solely for the purpose of receiving service of legal documents or process;
 "(E) submit to an examination by the State insurance commissioner in any State in which the group is doing business to determine the group's financial condition, if —
 "(i) the commissioner of the jurisdiction in which the group is chartered has not begun or has refused to initiate an examination of the group; and
 "(ii) any such examination shall be coordinated to avoid unjustified duplication and unjustified repetition;
"(F) comply with a lawful order issued —
 "(i) in a delinquency proceeding commenced by the State insurance commissioner if there has been a finding of financial impairment under subparagraph (E); or
"(ii) in a voluntary dissolution proceeding;
 "(G) comply with any State law regarding deceptive, false, or fraudulent acts or practices, except that if the State seeks an injunction regarding the conduct described in this subparagraph, such injunction must be obtained from a court of competent jurisdiction;
 "(H) comply with an injunction issued by a court of competent jurisdiction, upon a petition by the State insurance commissioner alleging that the group is in hazardous financial condition or is financially impaired; and
 "(I) provide the following notice, in 10-point type, in any insurance policy issued by such group:
`NOTICE
 `This policy is issued by your risk retention group. Your risk retention group may not be subject to all of the insurance laws and regulations of your State. State insurance insolvency guaranty funds are notavailable for your risk retention group.'
 "(2) require or permit a risk retention group to participate in any insurance insolvency guaranty association to which an insurer licensed in the State is required to belong;
 "(3) require any insurance policy issued to a risk retention group or any member of the group to be countersigned by an insurance agent or broker residing in that State; or
 "(4) otherwise discriminate against a risk retention group or any of its members, except that nothing in this section shall be construed to affect the applicability of State laws generally applicable to persons or corporations.
"(b) Scope of exemptions
 "The exemptions specified in subsection (a) of this section apply to laws governing the insurance business pertaining to —
 "(1) liability insurance coverage provided by a risk retention group for —
"(A) such group; or
"(B) any person who is a member of such group;
 "(2) the sale of liability insurance coverage for a risk retention group; and
"(3) the provision of —
"(A) insurance related services;
 "(B) management, operations and investment activities; or
 "(C) loss control and claims administration (including loss control and claims administration services for uninsured risks retained by any member of such group);
 for a risk retention group or any member of such group with respect to liability for which the group provides insurance."
 APPENDIX II Preemption Limits in the Liability Risk Retention Act
15 U.S.C. § 3905, ("Clarification concerning permissible State authority"), as added by Risk Retention Amendments of 1986, Pub.L. No.99-563, § 8(c), 100 Stat 3175, reads as follows:
 "(a) State motor vehicle no-fault and motor vehicle financial responsibility laws
 "Nothing in this chapter shall be construed to exempt a risk retention group or purchasing group authorized under this chapter from the policy form or coverage requirements of any State motor vehicle no-fault or motor vehicle financial responsibility insurance law.
"(b) Applicability of exemptions
 "The exemptions provided under this chapter shall apply only to the provision of liability insurance by a risk retention group or the purchase of liability insurance by a purchasing group, and nothing in this chapter shall be construed to permit the provision or purchase of any other line of insurance by any such group.
"(c) Prohibited insurance policy coverage
 "The terms of any insurance policy provided by a risk retention group or purchased by a purchasing group shall not provide or be construed to provide insurance policy coverage prohibited generally by State statute or declared unlawful by the highest court of the State whose law applies to such policy.
 "(d) State authority to specify acceptable means of establishing financial responsibility
 "Subject to the provisions of section 3902(a)(4) of this title relating to discrimination, nothing in this chapter shall be construed to preempt the authority of a State to specify acceptable means of demonstrating financial responsibility where the State has required a demonstration of financial responsibility as a condition for obtaining a license or permit to undertake specified activities. Such means may include or exclude insurance coverage obtained from an admitted insurance company, an excess lines company, a risk retention group, or any other source regardless of whether coverage is obtained directly from an insurance company or through a broker, agent, purchasing group, or any other person."
* On November 20, 1989, Senator Kasten proposed legislation (S 1936) to further amend the LRRA (Congressional Record — Senate, November 20, 1989, S 16382). Section 21(3) of this bill would expressly prohibit states from barring municipalities from joining risk retention groups. While we find it notable that this amendment has been offered to change the law, our opinion is restricted to a review of the LRRA in its present form.
* As noted in the Memorandum of the State Executive Department describing the edict:
"Due to the uniqueness of a reciprocal whose membership is limited to local governments, this bill requires such reciprocal to establish a risk management program and equitable risk classifications, and requires every subscriber to participate in the insurer's risk management program. Further, the bill authorizes the Superintendent [of Insurance] to promulgate additional standards (for example, in order to facilitate the reciprocal's organization, assure fair access for municipalities, safeguard its financial soundness, and the continuance of a viable organization) and requires compliance with any such additional standards" (McKinney's 1986 Session Laws of New York, Vol 1, pp 2862-63).