NATIONAL HOME INSURANCE COM-
PANY, (a risk retention group), and
Home Buyers Warranty Corporation II,
Plaintiffs,

v.

STATE CORPORATION COMMISSION
OF the COMMONWEALTH OF
VIRGINIA, et al., Defendants.

Civ. A. No. 93–1006–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 3, 1993.

Harvey B. Cohen, R. Scott Caulkins, John C. Pasierb, John E. Gagliano, Cohen, Gettings, Dunham & Harrison, P.C., Arlington, VA, for plaintiffs.

Peter B. Smith, Sr. Counsel, Michael D. Thomas, Asst. Gen. Counsel, State Corp. Com'n, Richmond, VA, Patrick H. Cantilo, Randolph N. Wisener, Steven E. Adkins, Rubinstein & Perry, LLP, Austin, TX, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

On July 2, 1993, the Virginia State Corporation Commission ("SCC") issued an order enjoining National Home Insurance Company ("NHIC"), a Colorado-based risk retention group, from conducting any new or additional business in Virginia. NHIC then brought this action challenging the SCC's authority to issue the injunction. Specifically, NHIC argues that the SCC injunction is invalid because the Product Liability Risk Retention Act, 15 U.S.C. § 3901 *et seq.*, (hereinafter "federal Risk Retention Act" or "Act"), permits only a "court of competent jurisdiction" to issue orders enjoining risk retention groups, and the SCC does not fit this description.

This matter originally came before the Court on NHIC's motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction. After two hearings, the Court denied NHIC's request for a TRO, finding that the requirements for a TRO were not met. To expedite resolution of this dispute, the Court, with the parties' concurrence and pursuant to Rule 65(a)(2), Fed.R.Civ.P., ordered that consideration of this matter on the merits be advanced and consolidated with the hearing on the motion for a preliminary injunction. The parties have agreed that the record is adequate to support a decision on the merits without further discovery or argument.

NHIC's motion for a TRO and preliminary injunction raises the novel question of whether the SCC is a "court of competent jurisdiction" under the federal Risk Retention Act. Addressing this question requires the Court to construe the Act, consider the extent to which it preempts state regulation of risk retention groups, and then consider whether any degree of abstention is appropriate in the circumstances.

## II.

■ A risk retention group is a corporation or other limited liability entity organized for the primary purpose of spreading the risks of liability exposure among its group members. *See* 15 U.S.C. § 3901(a)(4)(A)–(C) (1993); VA.CODE § 38.2–5101 (Supp.1992). NHIC is a risk retention group domiciled in Colorado. As such, it is subject to a tripartite scheme of concurrent federal and state regulation. Federal regulation is provided by the federal Risk Retention Act.[1] Next, NHIC is regulated by Colorado, its domiciliary state, under Colo.Rev.Stat. § 10–3–1401 to 43 (1993). And finally, NHIC and other risk retention groups operating in Virginia are regulated pursuant to Va.Code §§ 38.2–5100 *et seq.* (Supp.1992).

NHIC insures residential home builder-members in forty-eight (48) states and the District of Columbia. It issues "warranties" or policies to cover the liability risks of these builders, namely claims for losses resulting from structural and workmanship defects in the construction of new residential housing. Builder-members are the insured party under the warranties, while individual home-owners are the beneficiaries.

From NHIC's organization in 1986 until 1992, the company's reserves were calculated and certified by a professional actuarial firm. In connection with the company's 1991 audit and for reasons not disclosed in this record, NHIC retained a second firm to review the company's financial condition. This second firm concluded that NHIC was under-reserved for unearned premiums. Yet a third firm performed an actuarial review and concurred with this finding.[2] NHIC reported the deficiency in unearned premium reserves to the Colorado Division of Insurance ("CDI"). On January 14, 1993, the CDI issued an *ex parte* Summary Suspension Order ("Order") placing NHIC under the CDI's direct supervision. This Order, as later modified, required NHIC to "cease and desist" from the further transaction of insurance such that (i) no new builders could become group members; (ii) no single risk or hazard covered by NHIC could exceed $200,000 and; (iii) builder-members slated for annual renewal of group membership would henceforth be considered only for quarterly approval.

On May 24, 1993, NHIC and the CDI entered into a Stipulated Agreement and Or-

---

**1.** The Risk Retention Act was designed to help alleviate the liability insurance crisis which began in the late 1970's by increasing the availability of insurance and lowering premiums for small businesses. *See City Cab Co. v. Edwards,* 745 F.Supp. 757, 760 (D.Me.1990); *Cobert v. Home Owners Warranty Corp.,* 391 S.E.2d 263 (Va.1990).

**2.** Notwithstanding these multiple reviews, there is some dispute over the proper accounting methodology to be used in assessing the financial condition of risk retention groups. *See* Hearing

Minutes of 6/25/93 at 29, ll. 21–25. NHIC counsel noted the difficulty in reviewing NHIC's financial status, stating, "[t]here is no history out there to show how this kind of animal is supposed to work." Contributing to the problem is the fact that insurance actuarial models are often based on ten-year cycles. Since NHIC began operations in 1986, it has not yet been through a complete cycle. The Court need not reach this accounting methodology dispute in resolving the questions at bar.

der that created a Plan of Abatement ("Plan"). The Plan continues CDI's direct supervision of NHIC.[3] To this end, a CDI direct supervisor was placed in NHIC headquarters and remains there today. All NHIC expenditures must be approved by this CDI supervisor. Also pursuant to the Plan, NHIC received an initial infusion of 2.5 million dollars ($2,500,000). Further, the company must meet additional positive surplus targets by December 31, 1993 and July 1, 1994. As part of the Plan's monitoring program, NHIC must provide the CDI with financial projections in September and December of 1993 and March, 1994, and must submit semi-annual and annual financial statements reflecting not only loss and loss adjustment expenses, but also unearned premium and deficiency reserves. The Plan permits NHIC to insure warranties, provided net premiums written in any one quarter do not exceed four million dollars ($4,000,000), and provided no single risk exceeds $750,000. Significantly, the limitations contained in the Plan apply to NHIC's operations nationwide, not just its operations in Colorado. Pursuant to the Plan, the CDI issued a one-year stay concerning a finding of "financial hazard"[4] at NHIC.[5]

Rehabilitation of financially troubled risk retention groups is a major focus of Colorado's risk retention group regulations. To this end, Colorado's regulations contemplate remedial steps "with the purpose in mind that insurance companies committing or suffering a delinquency be rehabilitated where

and whenever possible with no loss of public confidence in the companies." COLO.REV. STAT. § 10–3–401 (1993). Consistent with this, the Plan was drafted to effectuate NHIC's rehabilitation, and gives NHIC seven months, from May until December, 1993, to meet its first surplus target. In order to allow time for the Plan to operate, a number of states, including Maryland, Florida, and Illinois, have apparently either rescinded cease and desist orders against NHIC, or have refrained from issuing such orders.

Virginia, in contrast to Colorado, takes a more restrictive regulatory stance. Testimony at SCC hearings indicates that Virginia regulators were uncomfortable with Colorado's Plan. Indeed, one witness from the Virginia Bureau of Insurance ("Bureau") testified, "I guess I have a problem as a regulator plugging the hole in the Company by allowing the Company to put on new business and bring in new policyholders when the Company is statutorily insolvent and impaired." This Colorado–Virginia conflict in regulatory philosophy underlies much of the current controversy.

On April 9, 1993, the Bureau filed a motion seeking a ninety (90) day temporary injunction against certain NHIC activities in the state. On May 18, 1993 the Bureau amended its motion, and sought to enjoin NHIC from issuing any new or renewal policies or certificates, or altering coverage under existing documents, until NHIC restored its capital and surplus to the minimum levels required by Colorado. SCC hearings on the petition

---

3. The pertinent Colorado statutory provision defines "direct supervision" as:

> the institution of control of an insurance company by order of the commissioner whereby one or more specifically enumerated acts shall be required of the company by order of the commissioner, or one or more specifically enumerated acts or decisions of the company shall not be permitted without prior written approval of the commissioner.

COLO.REV.STAT. § 10–3–402(3) (1993). A direct supervisor may take any steps necessary to preserve, protect, and recover an insurance company's assets while the company is under supervision. *Id.*

4. While the phrase "financial hazard" is not defined in either the Plan or the Act, the parties concur in the view that the term is synonymous

with "financially hazardous condition," which the Act defines. *See* 15 U.S.C. § 3901(a)(7) (1993).

5. The parties dispute the nature of the CDI's "stay." NHIC contends that the stay is currently in effect, and that under the stay, CDI has reserved judgment on a finding that NHIC is, or ever was, in a "financially hazardous condition." The SCC argues that CDI has already made such a finding, and that the stay can be triggered only by NHIC's compliance with the Plan. Hearing Minutes of 6/25/93 at 41, 11.12–16. In the alternative, the SCC contends that even if the stay is currently in effect, it merely stays a specific finding of "financial hazard," such that any CDI finding of impairment or insolvency at NHIC remains in effect. The Court need not reach a determination on the exact nature of Colorado's stay in order to resolve the issues at bar.

were scheduled. NHIC then filed a motion to dismiss the pending SCC action. First, NHIC argued that the federal Act preempted the SCC's ability to examine NHIC's financial condition. NHIC further argued that the SCC was not authorized to issue the requested injunction because it was not a "court of competent jurisdiction" within the meaning of the Act. The SCC, after denying NHIC's motion to dismiss, conducted a two-day hearing on the merits. At the close of hearing the SCC followed the Bureau's recommendations and issued an Order partially enjoining NHIC operations in Virginia until NHIC met Colorado's minimum surplus requirements.[6]

On July 8, 1993, NHIC filed a petition for suspension of the Order. NHIC also offered to post up to one million dollars ($1,000,000) in the form of a supersedeas bond.[7] The SCC denied this petition, and NHIC subsequently appealed the SCC Order to the Supreme Court of Virginia.[8] The Supreme Court, on recess during the month of August, did not immediately rule on NHIC's appeal. On August 2, 1993, while action was still pending in the Virginia Supreme Court, NHIC filed a motion for declaratory judgment in this Court.[9] The SCC responded by filing a motion to dismiss, stay, or abstain. On September 1, 1993, the Supreme Court of Virginia rejected NHIC's request for suspension of the SCC Order. One week later, NHIC filed additional pleadings with the SCC, seeking dissolution or, in the alternative, vacation of the Order. These additional pleadings before the SCC are apparently still pending. In addition, NHIC's appeal on the merits of the SCC Order is currently pending before the Supreme Court of Virginia.

## III.

The preemptive thrust of the Risk Retention Act is pellucidly clear. Section 3902(a)(1) of the federal Act preempts "any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would—make unlawful, or regulate, directly or indirectly, the operation of a risk retention group...." 15 U.S.C. § 3902(a)(1) (1993). Thus, the Act's structure and language make clear that "[t]he express preemption of state law with respect to risk retention groups is expansive." *City Cab Co. v. Edwards,* 745 F.Supp. 757, 761 (D.Me. 1990); *see Swanco Ins. Co. v. Hager,* 879 F.2d 353, 357 (8th Cir.1989), *cert. denied,* 493 U.S. 1057, 110 S.Ct. 866, 107 L.Ed.2d 950 (1990). Further confirmation of this appears in the Act's legislative history, which notes that preemption of state laws that inhibit the formation and continued operation of risk retention groups is "central" to the Risk Retention Act's objective of facilitating the development of risk retention groups. *See* Sen.Comm. on Commerce, Science, and Transportation, Risk Retention Amendments of 1986, S.Rep. No. 294, 99th Cong., 2d Sess. 3 (1986) [hereinafter "S.Rep. No. 294"]; *see also Fla. Dept. of Ins. v. National Amusement Purchasing Group Inc.,* 905 F.2d 361, 362 (11th Cir.1990).

But the Act's preemption, though substantial, is by no means complete. Substantial regulatory roles remain for domiciliary and non-domiciliary states. The Act is a significant federal intervention into the realm of insurance, an area traditionally left to state regulation. *See* 132 Cong.Rec. H 9695 (daily ed. Oct. 9, 1986) (statement of Rep. Florio); *see, e.g., Osborn v. Ozlin,* 310 U.S. 53, 65–66, 60 S.Ct. 758, 762–63, 84 L.Ed. 1074

---

6. Specifically, the Order permitted NHIC to issue certificates of insurance only in cases where (i) NHIC received both notification of a housing start and a deposit premium by June 30, 1993, or (ii) a member-builder obtained a building permit before June 30, 1993, and NHIC received notification of the housing start prior to September 1, 1993.

7. According to NHIC, the $1 million would be earmarked solely for Virginia claims, and is far in excess of the amount the company has ever paid out in Virginia claims. In 1992, NHIC paid

out approximately $140,000.00 in claims in Virginia, while in 1991 it paid out some $480,000.00 for Virginia claims.

8. Appeals from any SCC final order are heard, in the first instance, by the Virginia Supreme Court. Va.Code § 12.1–39 (1993).

9. This pleading was later amended to add the SCC Commissioners as defendants in their individual and official capacities, and to add a cause of action under 42 U.S.C. § 1983.

(1940). But however extensive the Act's preemptive effect may be, it does not entail extensive, day-to-day federal regulation of risk retention groups.[10] Indeed, Congress considered and rejected a comprehensive scheme of complete federal regulation of risk retention groups.[11] *Ins. Co. of Pennsylvania v. Corcoran*, 850 F.2d 88, 91 (2d Cir.1988) (*citing* H.R.Rep. No. 190, 97th Cong. 1st Sess. 6–7, *reprinted in* 1981 U.S.Code Cong. & Admin.News ("U.S.C.C.A.N.") 1432, 1435); *see also Swanco*, 879 F.2d at 357. Instead, the federal Act establishes a tripartite scheme for regulating risk retention groups. At the apex of the tripartite scheme, the Act establishes a federal framework within which domiciliary and non-domiciliary states may conduct day-to-day regulation of risk retention groups. To this end, the Act establishes various federal standards, including (i) definitions of risk retention groups and the types of coverage such groups may offer[12], (ii) specification of certain accounting procedures[13], and (iii) enumeration of circumstances under which domiciliary and non-domiciliary states may investigate and enjoin the operation of risk retention groups.[14] More specifically, the Act allows domiciliary and non-domiciliary states to investigate the financial condition of risk retention groups and then to enjoin their operation if they are found to be in a "financially hazardous condition." Thus, the Act creates a federal standard for evaluating financially troubled risk retention groups. This standard is significant in two respects. First, it establishes a measure of financial health that is qualitative and general in nature: A risk retention

group is in "hazardous financial condition" if it "is unlikely to be able ... to meet obligations to policy holders with respect to known claims and reasonably anticipated claims; or to pay other obligations in the normal course of business." 15 U.S.C. § 3901(a)(7)(A)–(B) (1993). Also significant is that this finding may be "based on present *or reasonably anticipated* financial condition." 15 U.S.C. § 3901(a)(7) (1993) (emphasis added). Significantly, this standard "is intended to make clear that regulatory intervention can occur at a time before a group actually becomes financially impaired or insolvent." House Committee on Energy and Commerce, Risk Retention Amendments of 1986, H.R.Rep. No. 865, 99th Cong., 2d Sess. 11–12 (1986) [hereinafter "H.Rep. No. 865"], *reprinted in* 1986 U.S.C.C.A.N. at 5308–9. Thus, while the Act creates a federal standard of "hazardous financial condition," it leaves to domiciliary and non-domiciliary states the application of the standard to individual risk retention groups.

Primary regulatory authority and enforcement power over risk retention groups is left to domiciliary, or chartering, states. *See* 15 U.S.C. § 3902(a)(1) (1993); *see also* H.Rep. No. 865 at 15, U.S.C.C.A.N. at 5312 (1986 Risk Retention Act amendments confirm the broad authority of chartering states in regulating risk retention groups). Only the chartering jurisdiction may directly regulate the formation and everyday operations of a risk retention group. 15 U.S.C. § 3902(a)(1) (1993). And the Insurance Commissioner of the domiciliary state has the initial authority

---

**10.** It is well-settled that the mere existence of a comprehensive federal regulatory scheme such as 15 U.S.C. § 3901 *et seq.* does not, by itself, imply complete federal preemption. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (employee's state law claim for intentional infliction of emotional distress allegedly suffered while working in nuclear power facility not preempted notwithstanding extensive federal regulation of nuclear safety).

**11.** In early drafts of what eventually became the Risk Retention Act, the Department of Commerce was given direct regulatory authority over risk retention groups. *Home Warranty Corp. v. Caldwell*, 777 F.2d 1455, 1470–71 (11th Cir. 1985), *cert. denied* 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 118 (1986). Such direct federal reg-

ulation was deleted from the final version of the Act. *Id.* at 1472.

**12.** *See* 15 U.S.C. § 3901 (1993).

**13.** *See* 15 U.S.C. § 3902(d)(3)(A)–(B) (1993) (loss and loss adjustment calculations must be made by a member of the American Academy of Actuaries or other qualified loss reserve specialist); House Committee on Energy and Commerce, Risk Retention Amendments of 1986, H.R.Rep. No. 865, 99th Cong., 2d Sess. 15 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5303, 5312 (loss and reserve accountings must be made pursuant to criteria established by the National Association of Insurance Commissioners).

**14.** *See* 15 U.S.C. § 3902(a)(1)(A)–(I) (1993).

to require a risk retention group to submit to a financial examination. *See, e.g.,* 15 U.S.C. § 3902(a)(1)(E)(i) (1993). Only if the domiciliary commissioner fails or declines to initiate a financial examination of a group can a non-domiciliary state then undertake an investigation. *Id.*

Non-domiciliary states have secondary regulatory authority over risk retention groups. The 1986 amendments to the Act significantly increased the regulatory authority of non-domiciliary states.[15] *See* H.Rep. No. 865 at 7, *reprinted in* 1986 U.S.C.C.A.N. at 5304; *see also* S.Rep. No. 294 at 8. In amending the Act, Congress was particularly concerned with balancing the Act's goal of encouraging the growth of risk retention groups with each state's interest in protecting consumers. *See* H.Rep. No. 865 at 21, *reprinted in* 1986 U.S.C.C.A.N. at 5318 ("the Committee must be alert to indications that the discretion of regulators has been so restricted that practices injurious to the public cannot be adequately addressed by regulators acting in good faith."). To create the appropriate balance, "Congress carefully crafted a scheme which, on the one hand, provides for broad preemption of a non-domiciliary state's licensing and regulatory laws but which, on the other hand, explicitly preserves for those states several very important powers." *National Amusement,* 905 F.2d at 363–64; *see also Corcoran,* 850 F.2d

at 91. Specifically, the Act now provides that many of the regulatory powers of non-domiciliary states are concurrent with those of chartering states.[16] Beyond this, the Act also grants authority to non-domiciliary states to specify acceptable means for risk retention groups to demonstrate "financial responsibility," subject to the Act's anti-discrimination provisions. 15 U.S.C. § 3905(d) (1992); *see Charter Risk Retention Group Ins. Co. v. Rolka,* 796 F.Supp. 154 (M.D.Pa. 1992). States may require such a showing as a condition for granting a risk retention group a license or permit to undertake specified activities within the state. 15 U.S.C. § 3905(d) (1992). In addition, any state may, after an investigation of a group's financial condition, commence a delinquency proceeding. 15 U.S.C. § 3902(a)(1)(F)(i).[17] The risk retention group may then be required to comply with any order resulting either from such an investigation, or from a voluntary dissolution proceeding. 15 U.S.C. § 3902(a)(1)(F)(i)–(ii) (1993). In sum, the Act grants non-domiciliary states substantial authority to monitor the financial condition of risk retention groups.

█ Pursuant to this authority, Virginia regulates the operation of risk retention groups within the Commonwealth. *See* VA. CODE §§ 38.2–5100 *et seq.* (Supp.1992). Specifically, in Virginia, "foreign" risk retention

---

15. Even before the Act's passage, concerns had been raised about the ability of non-chartering states to protect consumers from risk retention group practices. *See Caldwell,* 777 F.2d at 1472. Despite these concerns, non-domiciliary states were initially given little regulatory authority under the original 1981 Act. *See* H.Rep. No. 865 at 7, *reprinted in* 1986 U.S.C.C.A.N. at 5304. The 1986 Risk Retention Act amendments went through several versions, each giving increasingly broad regulatory powers to nonchartering states. *See* 132 Cong.Rec. S 15456 (daily ed. Oct. 6, 1986) (statement of Sen. Gore); 132 Cong.Rec. S 15456 (daily ed. Oct. 6, 1986) (statement of Sen. Lautenberg).

16. Thus non-domiciliary, as well as domiciliary, states may require a risk retention group to:
 1. comply with the unfair claim settlement practices under the law of the state.
 2. pay, on a nondiscriminatory basis, applicable state premiums and other taxes.
 3. participate, on a nondiscriminatory basis, in any mechanism established or authorized

under state law for the equitable apportionment of liability insurance losses and expenses.
 4. register with and designate the State insurance commissioner as its agent for the purpose of receiving service, legal documents or process.
 5. comply with any state law regarding deceptive, false, or fraudulent acts or practices.
 6. provide notice, in the text of any insurance policy issued in the non-domiciliary state, that the group may not be subject to certain non-domiciliary state regulations.
 7. participate in any insolvency guaranty association, as required by state law.
 8. issue insurance policies countersigned by an insurance agent or broker residing in the state.
 15 U.S.C. § 3902(a)(1)(A)–(I) (1993).

17. Worth repeating here is that a non-domiciliary state may not initiate an investigation of a risk retention group unless the chartering state declines to do so. 15 U.S.C. § 3902(a)(1)(E)(i)–(ii) (1993).

groups must submit several documents to the SCC before commencing operations in the state. These documents include a copy of the group's financial statement, as submitted to its domiciliary state, certified by an independent public accountant and containing a statement of opinion on loss and loss adjustment reserves. VA.CODE § 38.2–5103(2)(a) (Supp.1992).[18] Foreign risk retention groups must also submit, upon SCC request, a copy of any information or documents pertaining to an outside audit of the group. VA.CODE § 38.2–5103(2)(c) (Supp.1992). Consistent with the Act, submission to an SCC audit is required only if the commissioner of the group's domiciliary state does not initiate an examination within sixty (60) days of a SCC request. VA.CODE § 38.2–5103(6) (Supp. 1992).

In summary, the Act's tripartite scheme of concurrent federal and state regulation may be compared to a complex drama in which the Act provides the script that sets the stage and defines the roles for domiciliary and non-domiciliary states. Given this metaphor, NHIC's contentions amount to a claim that non-domiciliary state Virginia, acting through its Bureau of Insurance and the SCC, has misread the script and played a role neither permitted nor contemplated under the Act. Thus, NHIC contends that the Act's scheme or script did not permit Virginia to seek an injunction against NHIC, nor did it permit the SCC to issue an injunction with respect to NHIC or any other risk retention group, because the SCC is not a "court of competent jurisdiction" under the Act. NHIC further argues that even if the

SCC is a "court of competent jurisdiction," it did not, in this instance, act like one. Each of these matters must be separately considered, followed by the further consideration of whether this Court should abstain in favor of the Supreme Court of Virginia with respect to any of these matters.

## IV.

NHIC's threshold argument is that the Act's expansive preemptive scope precluded Virginia from taking any action, through its Bureau of Insurance and the SCC, to enjoin NHIC from conducting new or additional business in Virginia. This argument is unpersuasive. To the contrary, it appears that Virginia did precisely what the Act authorizes a non-domiciliary state to do in the circumstances. While the Act precludes non-domiciliary states from initiating financial "examinations" of risk retention groups unless chartering states decline to do so,[19] nothing in the Act precludes these states from reviewing information developed as a result of a chartering state's examination, and taking appropriate action. Nor does the Act compel a non-domiciliary state to follow the chartering state's lead in taking action based on a financial examination of a risk retention group. Rather, non-domiciliary states are free to follow a course of action with respect to a troubled risk retention group that is different from the course of action plotted by the chartering state, provided that course of action does not contravene the Act.[20] Put another way, the Act does not dictate that a specific action be

---

**18.** The Virginia provision mirrors the federal Act, which requires a risk retention group to submit a plan or study to the insurance commissioner of each state in which it intends to do business. *See* 15 U.S.C. § 3902(d)(2) (1993).

**19.** 15 U.S.C. § 3902(a)(1)(E)(i). In requiring risk retention groups to submit to "an examination ... to determine the group's financial condition," the Act does not define the term "examination." *Id.* Even so, the term's meaning is not difficult to discern given the context. It is apparent that an "examination" in this context consists of whatever investigatory steps or measures, including an audit or review of the group's business or financial books and records, that may be necessary to enable the state regulator to reach confident conclusions concerning the group's fi-

nancial condition. It is equally apparent that a state does not conduct an "examination" under the Act merely by reviewing either publicly available material or the results of an "examination" performed by another state under the Act.

**20.** The Virginia statute under which the SCC enjoined NHIC explicitly contemplates this limitation and provides:

> [t]he Commission is authorized to make use of any of the powers established under Titles 12.1 and 38.2 to enforce the laws of this Commonwealth so long as those powers are not specifically preempted by the Product Liability Risk Retention Act of 1981, as amended by the Risk Retention Amendments of 1986.

VA.CODE § 38.2–5110 (1990).

taken in all situations involving a financially troubled risk retention group. Congress properly recognized that states might reasonably differ on the appropriate course of action to follow to protect their citizens when a financially troubled risk retention group seeks to continue doing business in a state.

Precisely this occurred here. Consistent with the Act, Virginia's Bureau of Insurance did not initiate an independent financial examination of NHIC, but instead appropriately reviewed and relied on relevant information from NHIC's domiciliary state of Colorado.[21] Also consistent with the Act, Virginia's Bureau of Insurance reviewed these results and information through the lens of the federal standard, namely whether NHIC was "in hazardous financial condition or financially impaired." *See* 15 U.S.C. § 3902(a)(1)(H).[22] Further, the Bureau of Insurance acted consistently with the Act when it initiated proceedings against NHIC

before the SCC on the premise, disputed here, that the SCC is a "court of competent jurisdiction.[23] And finally, nothing in the Act requires that Virginia accept Colorado's policy decision to allow NHIC to continue to operate subject to the Plan.

In sum, there is no merit to NHIC's contention that Virginia's Bureau of Insurance impermissibly conducted an "examination" under the Act when it reviewed and relied on information developed in CDI's examination, or otherwise publicly available information. Nor is there any merit to NHIC's contention that the Act barred Virginia, as a non-domiciliary state, from seeking an injunction from a state court of competent jurisdiction. Still to be decided, however, is whether the SCC is a "state court of competent jurisdiction" under the Act and, if so, whether the issuance of the injunction against NHIC was otherwise substantively appropriate under the Act.[24]

21. Specifically, the Bureau's Motion for Injunction against NHIC notes that the decision to seek an injunction was based on a "review of National Home's Annual Statement and the reported negative surplus," as disclosed by CDI's examination.

22. The parties dispute whether the SCC ever determined that NHIC was in "hazardous financial condition," as defined in the Act. NHIC contends that the SCC merely determined that the company was "financially impaired" and points to the SCC Order, which states, in pertinent part:

THE COMMISSION ... is of the opinion and finds that Defendant is financially impaired and that Va. Code § 38.2–5103.8.b specifically prohibits the solicitation or sale of insurance by, or operation of, a risk retention group in the Commonwealth of Virginia that is in hazardous financial condition or is financially impaired.

The SCC, on the other hand, points to the plain language of the Act, which states that "a risk retention group may be enjoined upon petition that the group is *in hazardous financial condition or is financially impaired.*" 15 U.S.C. § 3902(a)(1)(H) (1993) (emphasis added). SCC proceedings focused sharply on the relationship between the terms "hazardous financial condition," "impaired," and "insolvent" within the meaning of the Risk Retention Act. A spokesman for the Bureau initially stated that, "[w]e have gone beyond financial hazard in this case, Your Honor. Colorado has already found that they are insolvent and/or financially impaired." Hearing Minutes of 6/29/93 at 118, 11. 7–19. The SCC, after receiving additional evidence, concluded that "[h]azardous financial condition

by our statute appears to be not quite as bad as financial impairment or insolvent ... insolvent is the worst." Hearing Minutes of 6/29/93 at 181, 11. 9–16. Thus, a risk retention group may be in "hazardous financial condition" before reaching a state of either insolvency or financial impairment. Hearing Minutes of 6/29/93 at 181, 11. 23–25; at 182 11. 1–2. Accordingly, the SCC apparently concluded that NHIC's financial condition was worse than "hazardous"; it was "impaired." Thus, the SCC correctly concluded that the federal standard governed. But whether the SCC properly construed and applied that standard are issues this Court abstains from deciding, leaving them instead to be decided by the Supreme Court of Virginia.

23. This disputed premise is the subject of the next section.

24. NHIC argues that Virginia's traditional "hostility" to the operation of risk retention groups drove the SCC to find a "hazardous financial condition" at NHIC. While acknowledging that states hostile to risk retention group formation and operation could use expanded regulatory powers to "thwart" these groups, Congress amended the Act in 1986 on the presumption that state regulatory officials would act in "good faith." H.Rep. No. 865 at 21, *reprinted in* 1986 U.S.S.C.A.N. at 5318. NHIC has not shown that the SCC acted in anything less than good faith in partially enjoining the company's Virginia operations. But not decided here, and left instead to the Supreme Court of Virginia pursuant to abstention principles, is whether the SCC's injunction is warranted given the record, the standards established in the Act and any applicable state laws not preempted by the Act.

**1114**

## V.

Domiciliary and non-domiciliary states may require a risk retention group to comply with an injunction issued by a "federal or [s]tate court of competent jurisdiction" where the injunction is based upon a petition by the state insurance commissioner alleging that the group is "in hazardous financial condition or is financially impaired." 15 U.S.C. § 3902(a)(1)(H) (1993); *see also* 15 U.S.C. § 3902(e)(2) (1993); 15 U.S.C. § 3902(f)(1)–(2) (1993); 15 U.S.C. § 3906 (1992); *National Amusement*, 905 F.2d at 367 (permanently enjoining company from "soliciting or transacting, or aiding the transaction of the business of insurance" in Florida). The Virginia Bureau of Insurance brought such a petition before the SCC. The question, therefore, becomes whether the SCC is a "court of competent jurisdiction" within the meaning of the Act, and thus empowered to enjoin risk retention groups upon petition by the Bureau of Insurance.

■■■■■ The Act does not define the phrase "court of competent jurisdiction." *Cf.* 15 U.S.C. § 3901 (1993) (defining certain terms found in the Act). And there do not appear to be any reported cases defining "court of competent jurisdiction" within the meaning of the Act. Accordingly, the phrase should be given its ordinary meaning. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985) (statutory analysis begins "with the language employed by Congress and the assumption that the ordinary meaning of the language accurately expresses the legislative purpose"); *see also American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). The phrase "court of competent jurisdiction" normally refers to courts having subject matter jurisdiction. *See United States v. Morton*, 467 U.S. 822, 828 n. 7–8, 104 S.Ct. 2769, 2773 n. 7–8, 81 L.Ed.2d 680 (1984); *Tomai–Minogue v. State Farm Mut. Auto Ins. Co.*, 770 F.2d 1228, 1242 (4th Cir.1985) (Sprouse, J.,

dissenting). The SCC's subject matter jurisdiction "extends to issues of statewide concern" regarding corporate regulation. *Atlas Underwriters, Ltd. v. State Corp. Comm'n*, 237 Va. 45, 375 S.É.2d 733, 734 (1989). In addition, the SCC is the government entity charged with licensing foreign corporations, such as NHIC, to do business in the Commonwealth. VA. CONST. art. IX § 2 (1973). Indeed, except as otherwise prescribed by law, the SCC administers all laws regulating corporations operating in the state. VA.CODE § 12.1–12 (1993). Finally, the SCC has specific regulatory jurisdiction over risk retention groups pursuant to Va.Code §§ 38.2–5110 *et seq.* (1990 and Supp.1992). Plainly, then, the SCC has subject matter jurisdiction over NHIC.

■■■■■ Given this, the next inquiry is whether the SCC is a "court." Because the Act does not define "court of competent jurisdiction," it seems apparent that Congress expected this determination to be made by reference to state law, for it is state law that typically defines a "state court of competent jurisdiction." [25] Under Virginia law, it is well settled that the SCC may function as a court. The SCC is vested with judicial powers and duties. *See* VA.CODE §§ 12.1–1—12.1–43 (1993); *Richmond v. Chesapeake & Potomac Tel. Co.*, 127 Va. 612, 105 S.E. 127 (1920); *see also Prentis v. Atl. C.L. Co.*, 211 U.S. 210, 223, 29 S.Ct. 67, 68, 53 L.Ed. 150 (1908) ("we shall assume that for some purposes [the SCC] is a court ... in the commonly accepted sense of that word."). Indeed, the SCC has a stature and dignity equal to that of a circuit court. *Atlas Underwriters*, 375 S.E.2d at 734; *see also Virginia Nat'l Bank v. Virginia*, 320 F.Supp. 260, 262 (E.D.Va. 1970), *appeal dismissed* 448 F.2d 425 (4th Cir.1971) ("[t]he State Corporation Commission is undeniably a court"). Further, the SCC has the powers of a court of record to administer oaths, compel the attendance of witnesses and production of documents, and punish for contempt, VA.CODE § 12.1–13

**25.** Analogous authority supports this conclusion. *See, e.g., Roudebush v. Hartke*, 405 U.S. 15, 21, 92 S.Ct. 804, 808, 31 L.Ed.2d 1 (1972) (Indiana law should be used in determining whether Indiana court "engages in a judicial function in connection with an election recount"); *Hill v. Martin*,

296 U.S. 393, 397–98, 56 S.Ct. 278, 280, 80 L.Ed. 293 (1935) (federal court in tax injunction case must use New Jersey law to determine whether pending state tax collection proceedings had "passed from the administrative into the judicial stage.").

(1993), and enforce compliance with its orders through fines and other penalties as prescribed or authorized by law. *Id.;* VA. CONST. art. IX § 3 (1973). The SCC has the power to issue temporary and permanent injunctions, VA.CODE § 12.1–13 (1993), and at least one SCC Commissioner must have the qualifications prescribed for judges of courts of record. VA.CODE § 12.1–9 (1993). Finally, like other courts, the SCC must afford all parties reasonable notice of proceedings, an opportunity to be heard, and the opportunity to present evidence prior to entry of any finding, order, or judgment. VA. CONST. art. IX § 3 (1973); VA.CODE § 12.1–28 (1993); *see also Commonwealth v. Atl. C.L.R. Co.,* 106 Va. 61, 55 S.E. 572, 573 (1906) (noting that "[t]he SCC cannot impose a fine upon a corporation without summoning the company before it, hearing what it has to say in its defense, and passing judgment thereon judicially—in other words, giving the company a fair trial as in any other court."). Unquestionably, then, the SCC may function as a "court of competent jurisdiction" within the meaning of the Act.[26]

But this does not end the analysis, as the SCC may also function in a legislative capacity. *See Clifton Forge–Waynesboro Tel. Co. v. Commonwealth,* 165 Va. 38, 181 S.E. 439, 443 (1935); *Winchester & Strasburg R. Co. v. Commonwealth,* 106 Va. 264, 55 S.E. 692, 693 (1906).[27] Thus, the further question to be answered is whether the SCC acted in its judicial capacity in this instance. As Justice Holmes noted, when a body has both legislative and judicial powers, a determination of the capacity in which the body acts "depends ... upon the character of the proceedings." *Prentis,* 211 U.S. at 226, 29 S.Ct. at 69. Thus, it has been held that the SCC acts in a legislative capacity when it enters a general order or regulation not directed against a specific party. *See American Bankers Life Assur. Co. v. Div. of Consumer Counsel, Office of Atty. Gen.,* 220 Va. 773, 263 S.E.2d 867, 874–5 n. 8 (1980). Legislation is future-oriented and changes the

---

**26.** NHIC argues vigorously that the SCC cannot be a court of competent jurisdiction because it is not independent of the Bureau of Insurance, and the Act's drafters intended that a "court of competent jurisdiction" must be "independent" of the state body responsible for insurance regulation. In support of this contention, NHIC urges the Court to consider affidavits of two persons who ostensibly participated in the drafting of the Act.

Yet affidavits of this genre are not persuasive. Post-enactment comments of legislators carry no probative weight, but only represent the personal views of the legislator. *Buckeye Prod. Credit Ass'n v. Farm Credit Admin.,* 787 F.Supp. 578, 588–89 n. 22 (E.D.Va.1992), *rev'd on other grounds* 997 F.2d 11 (4th Cir.1993); *see Bread Political Action Comm. v. Fed. Election Comm'n,* 455 U.S. 577, 581 n. 3, 102 S.Ct. 1235, 1238 n. 3, 71 L.Ed.2d 432 (1982) (refusing to give probative weight to affidavits of U.S. Senator and executive assistant regarding meaning of contested statutory language); *see also Jaekel v. Equifax Marketing Decision Systems, Inc.,* 797 F.Supp. 486, 489 n. 7 (E.D.Va.1992) (noting that post-hoc nature of legislative history of 1991 Civil Rights Act made it "a contradictory, ambiguous, unreliable indicator of legislative intent."). As the Seventh Circuit recently concluded:

> [s]ubsequent writings may be nothing but wishful thinking, and unless they are uttered as a part of the process of enacting a later law (and therefore show assumptions on which Congress as a whole acted at least once) they are of no account.... Legislative history gen-

erated in the course of litigation has even less utility, for it may be designed to mislead, to put an advocate slant on things.... [T]he concern for accuracy ... leads us to draw the line at statements made in Congress. The [parties] have not drawn to our attention any case in which a federal court relied on affidavits written for purposes of litigation as a source of reliable information about the meaning of a statute.... Our declining to consider latter-day descriptions will induce Members of Congress to put their thoughts on record when they should—before the bill becomes law, when there is still time for other Members to deny the claims or amend the bills to avoid consequences they do not approve.

*Farrand v. Lutheran Bhd.,* 993 F.2d 1253, 1255–56 (7th Cir.1993), *citing Covalt v. Carey Canada, Inc.,* 860 F.2d 1434, 1438–39 (7th Cir.1988). *See also Continental Can Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund,* 916 F.2d 1154, 1157 (7th Cir.1990) (noting that "statements after enactment do not count; the legislative history is valuable only to the extent it shows genesis and evolution.").

In sum, the Act does not, by its terms, require that the SCC be "independent" of the Bureau of Insurance, nor is there any compelling or persuasive reason to read this extra requirement into the Act's text.

**27.** *See, e.g., Prentis,* 211 U.S. at 225, 29 S.Ct. at 69 (indicating that a state is constitutionally permitted to vest legislative and judicial powers in the same body).

existing status quo through the making of a new rule or regulation. *See Prentis*, 211 U.S. at 225, 29 S.Ct. at 69. As such, the SCC acts in its legislative capacity when it sets utility rates. *Norfolk v. Chesapeake & Potomac Tel. Co.*, 192 Va. 292, 64 S.E.2d 772, 776 (1951). By contrast, it is settled that the SCC acts in an adjudicative capacity when it enters an order or judgment against a specific, named party. *See American Bankers*, 263 S.E.2d at 874–5 n. 8. In a judicial inquiry, the SCC "investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." *Prentis*, 211 U.S. at 225, 29 S.Ct. at 69; *see New Orleans Public Service, Inc., v. Council of New Orleans* ("NOPSI"), 491 U.S. 350, 370, 109 S.Ct. 2506, 2519, 105 L.Ed.2d 298 (1989).

Given these general principles, it appears that the SCC acted in its judicial capacity in partially enjoining NHIC. To begin with, the SCC's Order was directed at a single, specified party, was based on past and present facts about NHIC, and was issued pursuant to an existing federal standard. Moreover, the proceedings against NHIC were "manifestly formal and adversarial, 'judicial in nature,'" and subject to judicial review. *Phillips v. Virginia Board of Medicine*, 749 F.Supp. 715, 722–23 (E.D.Va.1990) (holding that license revocation proceeding by the Virginia Board of Medicine was "judicial"); *see, e.g., Ohio Civil Rights Comm'n v. Dayton Christian Schools*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (state civil rights commission proceedings deemed "judicial" in nature).

Yet, this is not the full story. While several important factors support the conclusion that the SCC acted in its judicial capacity, NHIC contends that other factors point to the opposite conclusion. First the SCC chairman observed, carelessly perhaps, that the SCC conducted NHIC hearings in its legislative capacity. Plainly, the SCC must sit in its judicial capacity in order to function as a "court of competent jurisdiction." Further, the SCC must follow certain prescribed procedures when sitting as a court of record, and it is unclear whether such procedures were in fact followed. As a general rule, tribunals such as the SCC are not bound by strict or technical rules of evidence, even when sitting in an adjudicatory capacity.[28] *See Comment Note.—Hearsay Evidence in Proceedings Before State Administrative Agencies*, 36 A.L.R.3d 12, 26 (1971), 2 AM. JUR.2d *Admin.Law* § 378 (1962 and Supp. 1992). This general rule applies when the SCC acts in its legislative capacity. *See Paging, Inc. v. Afton Communications Corp.*, 221 Va. 704, 273 S.E.2d 775 (1981); *Norfolk & W.R. Co. v. Commonwealth*, 162 Va. 314, 174 S.E. 85 (1934) (decided under prior law). SCC adjudicatory proceedings stand on a different footing. In all complaints, proceedings, contests or controversies in which the SCC decides or renders judgment in its capacity as a court of record, the SCC must follow the common law and statutory rules of evidence observed and administered by Virginia courts. VA.CODE § 12.1–30 (1993); *Com. ex rel. Atty. Gen. v. Washington Gas Light Co.*, 221 Va. 315, 269 S.E.2d 820, 826 (1980). The record raises substantial questions concerning whether the SCC followed proper evidentiary rules during NHIC proceedings.[29] These questions are not reached

---

**28.** *See, e.g., Baker v. Babcock & Wilcox Co.*, 11 Va.App. 419, 399 S.E.2d 630, 634 (1990) (relaxed evidentiary standard applies in Virginia Employment Commission proceedings); *Williams v. Fuqua*, 199 Va. 709, 101 S.E.2d 562, 566 (1958) (applying relaxed evidentiary standard to Virginia Industrial Commission hearings).

**29.** After noting that the SCC was sitting in its legislative capacity, the SCC Chairman further noted that "the rules regarding hearsay evidence are somewhat relaxed as our administrative practice typically allows. We admit some things that are technically hearsay, but we do rule as to their probative value." Hearing Minutes of 6/29/93 at 151, ll. 9–15.

The record discloses some ambivalence concerning the admissibility of hearsay. Thus, questions regarding introduction of the Plan into evidence were raised on the first day of hearings. *See* Hearing Minutes of 6/28/92 at 123–24. Nonetheless, the matter was not ultimately addressed until the following day, by which time the Plan had been cited on numerous occasions. Hearing Minutes of 6/29/93 at 314–16. There was further confusion over the admissibility of NHIC's annual statements. After an objection by NHIC counsel, the SCC required the Bureau to lay a foundation for introduction of the annual statements as business records. Hearing Minutes of 6/28/93 at 142–43. The statements, at least in part, were

here. Instead, pursuant to settled principles of abstention, these questions are best left to the Supreme Court of Virginia, the tribunal vested with exclusive jurisdiction to review all final SCC orders.[30]

## VI.

■ Abstention under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), requires (i) that there is a pending state judicial proceeding; (ii) that the action implicates important state interests and (iii) that there is an adequate opportunity for the plaintiff to raise federal constitutional claims in a state forum. *Middlesex Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982); *see Phillips*, 749 F.Supp. at 720.[31] Each of these requirements is met here.

■ First, *Younger* abstention is appropriate only if there is a pending state judicial proceeding. *See Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 238, 104 S.Ct. 2321, 2328, 81 L.Ed.2d 186 (1984); *Telco Communications, Inc. v. Carbaugh*, 885 F.2d 1225, 1228 (4th Cir.1989), *cert. denied* 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 286 (1990). NHIC's appeal of the SCC Order is currently pending before the Supreme Court of Virginia, which is constitutionally designated to rule on the merits of SCC final orders. *See Atlas Underwriters Ltd.*, 375 S.E.2d at 735 (holding that "the Framers of Article IX § 4 [of the Virginia Constitution] intended that the Supreme Court [of Virginia] have exclusive jurisdiction over all challenges to all actions of the SCC, both judgmental and ministerial"). Thus, there is undoubtedly a pending state judicial action involving the case at bar.[32]

Second, there is no doubt that *Younger* abstention in the instant case would vindicate important state interests. Virginia has a significant interest in protecting consumers from the potential hazards generated by the continued operation of financially troubled risk retention groups.[33] Indeed, one of the primary purposes behind the 1986 Risk Retention Act amendments was to bolster the ability of non-domiciliary states to develop safeguards to protect consumers from the consequences of insolvent risk retention

ultimately admitted. The propriety of these SCC rulings is best reviewed and resolved by the Supreme Court of Virginia.

Also best left to the Supreme Court of Virginia is the merits of NHIC's contention that the SCC did not make sufficient findings of fact regarding the injunction's scope. *See* Hearing Minutes of 6/29/93 at 454, ll. 19–25; at 455 1.1.

**30.** Va. Const. art. IX § 4 (1973); *see Howell v. State Corp. Comm'n*, 214 Va. 128, 198 S.E.2d 611 (1973).

**31.** While *Younger* initially applied only to criminal proceedings, the doctrine has been extended to apply in a number of civil contexts. *See, e.g., Ohio Civil Rights Comm'n v. Dayton Christian Schools*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (state administrative civil rights proceeding); *Middlesex County Ethics Comm.*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (state bar disciplinary proceeding); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (state contempt proceedings).

**32.** Two proceedings related to the case at bar are ongoing. The first pending proceeding is NHIC's appeal before the Supreme Court of Virginia, which is clearly judicial in nature. The second proceeding stems from additional papers NHIC has filed with the SCC, seeking dissolution of the Order. The SCC contends that since the SCC's proceedings are "manifestly formal and adversarial," and "judicial in nature," *see Phillips*, 749 F.Supp. at 722, the action pending before the SCC may satisfy the requirement of pending judicial action. *See Kim–Stan, Inc. v. Dep't of Waste Management*, 732 F.Supp. 646, 649 (E.D.Va.1990), citing *Telco Communications*, 885 F.2d at 1225 (indicating that *Younger* abstention may apply to state proceedings, including administrative hearings, that are "judicial in nature"). NHIC, on the other hand, contends that the proceedings before the SCC are administrative, and the mere availability of state judicial review of such proceedings cannot form the basis for *Younger* abstention. *See Norfolk & W. R. v. Public Utilities Comm'n.*, 926 F.2d 567, 572 (6th Cir.1991); *Thomas v. Texas State Bd. of Med. Examiners*, 807 F.2d 453, 456 (5th Cir.1987). NHIC's claim is ultimately irrelevant, as the Court is abstaining in favor of the judicial proceedings pending in the Supreme Court of Virginia, not in favor of any pending SCC action. Accordingly, the Court need not reach the issue of whether actions pending before the SCC constitute "pending judicial proceedings" for purposes of *Younger* abstention.

**33.** This interest is underscored by the SCC's constitutional mandate to represent the interests of Virginia consumers. Va. Const. art. IX § 2 (1973); Va.Code § 12.1–12 (1993).

groups. *See* H.Rep. No. 865 at 11, *reprinted in* 1986 U.S.S.C.A.N. at 5308. In addition, the regulation of insurance has been traditionally left to the states, and may invoke such significant state interests that abstention is appropriate. *See Alleghany Corp. v. McCartney,* 896 F.2d 1138 (8th Cir.1990) (federal court properly abstained under *Younger* regarding constitutional challenge to state act under which state Director of Insurance denied application for acquisition of a domestic insurance company).[34] And the Fourth Circuit has recently indicated that abstention should be carefully considered when federal courts are asked to rule upon complex state insurance regulatory schemes. *Charleston Area Med. Ctr. Inc. v. Blue Cross and Blue Shield Mut., Inc.,* 6 F.3d 243, 250 (4th Cir.1993) (noting that an analysis of West Virginia's complex insurance regulatory scheme "presents precisely the type of litigation in which federal courts should carefully consider abstaining.").

Deciding in this case whether the SCC properly functioned as a "court of competent jurisdiction" within the meaning of the federal Risk Retention Act has significant implications for future administration of Virginia's risk retention group regulatory scheme. Virginia has a significant interest in determining under what circumstances it may enjoin, or seek some other remedy against, a troubled risk retention group. The Bureau of Insurance obviously has a great interest in

determining appropriate fora in which to bring injunctive actions against financially troubled risk retention groups. And state insurance regulators have an interest in knowing what procedures will be followed in regulatory proceedings involving risk retention groups. In light of the state's interest in protecting consumers, as well as the state's interest in clarifying the operation of its risk retention group regulations, the second criterion for *Younger* abstention is conclusively met.

Finally, *Younger* abstention is warranted if the plaintiff in the federal action has an adequate opportunity during state proceedings to raise constitutional challenges. *Younger,* 401 U.S. at 37, 91 S.Ct. at 746. NHIC unquestionably has the opportunity to raise its constitutional challenges before the Supreme Court of Virginia. The Virginia Supreme Court is explicitly empowered to hear cases challenging the constitutionality of a law under the United States Constitution. VA. CONST. art. VI § 1 (1973). Because any NHIC constitutional claims are plainly reviewable in state proceedings, the third *Younger* abstention requirement is satisfied. Thus, all three of the requirements necessary for *Younger* abstention have been met.

▪ But *Younger* abstention is not always appropriate, assuming the three prerequisites are met.[35] *See Richmond, F. & P. R.R. Co. v. Forst,* 4 F.3d 244, 251 (4th Cir.

---

**34.** Abstention in the context of insurance regulation has been more frequently considered under the principles set forth in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). While some circuits have held that *Burford* abstention applies when difficult questions of state law arise in the context of insurance regulation, *see Hartford Cas. Ins. Co. v. Borg–Warner Corp.,* 913 F.2d 419 (7th Cir.1990) (abstaining in light of ongoing state rehabilitation proceedings), other courts have declined to abstain. *Compare Melahn v. Pennock Ins., Inc.,* 965 F.2d 1497, 1507 (8th Cir.1992), citing *Bilden v. United Equitable Ins. Co.,* 921 F.2d 822, 827 (8th Cir.1990) ("the factors favoring abstention are simply insufficient in weight and number to overcome the strong preference for exercise of federal jurisdiction, [despite recognition] that [Missouri] has created a complex regulatory scheme to govern insurance and these regulations serve important state interests."); *Bob's Home Serv. Inc. v. Warren County,* 755 F.2d 625, 627–28 (8th Cir.1985) (holding that *Burford* abstention was

not appropriate although issue raised was "an important one to the local community and state government.").

> Since *Younger* abstention is proper in the instant case, the Court does not address whether abstention under the doctrines set forth in *Burford, Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), or *Railroad Comm'n v. Pullman Comp.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) might also apply.

**35.** The Court is mindful that abstention is "an extraordinary and exceptional exception," and should not be used by a district court to abdicate its duty to fully adjudicate issues before it. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 14, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Cox v. Planning Dist. I Community Mental Health Retardation Services Bd.,* 669 F.2d 940, 942 (4th Cir.1982).

1993). Abstention is still inappropriate if plaintiff can show that (i) the challenged statute "flagrantly and patently" violates express constitutional provisions or (ii) that plaintiff will suffer irreparable injury if the federal court abstains because there is no adequate remedy at law. *Younger*, 401 U.S. at 53–54, 91 S.Ct. at 754–55. While the first *Younger* exception is clearly inapplicable in the instant case,[36] the second exception raises legitimate concerns. Yet, on closer examination, these concerns do not bar *Younger* abstention in this case.

 Pursuant to the second *Younger* exception, NHIC argues that it will be left "remediless" if the Court abstains, as lengthy delays often encountered in state courts could irreparably harm the company by forcing builders to turn elsewhere for insurance coverage. NHIC further contends that builders currently covered by NHIC warranties will be harmed if the SCC injunction is left in place. Considerations of delay are relevant in determining whether abstention is appropriate. *See Anderson v. Babb*, 632 F.2d 300, 306 n. 3 (4th Cir.1980); *see, e.g., Harman v. Forssenius*, 380 U.S. 528, 537, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) (indicating that a district court properly declined to abstain in challenge to state voting scheme "[g]iven the importance and immediacy of the problem, and the delay inherent" in waiting for state court action). Yet, given the facts of this case, NHIC's argument is not persuasive. Mere delay, in itself, in pending state court proceedings does not necessarily give rise to the type of "irreparable injury" that precludes *Younger* abstention. *See Simopoulos*, 644 F.2d at 330; *see, e.g., Rakes v. Coleman*, 359 F.Supp. 370, 376 (E.D.Va.1973) (noting that, within the context of pending criminal prosecutions, "cost, anxiety, and inconvenience" do not in themselves give rise

to "irreparable injury"). Moreover, the nature of the SCC Order mitigates any injury that NHIC might suffer, as it does not fully preempt NHIC's Virginia operations, but merely prevents NHIC from issuing new policies or certificates of insurance, or amending current policies. Further, the Order remains in effect only until NHIC meets the surplus and capitalization requirements of its chartering state of Colorado. At least theoretically, NHIC could meet these requirements tomorrow, negating any argument that excessive delays in state court will irreparably harm the company. In any event, there is no reason to expect that the Supreme Court of Virginia will decline to act expeditiously in this matter. Given this, the specter of delay is no bar to abstention. Should delay occur, however, NHIC has leave to return to this Court to pursue its claims.

## VII.

In summary, the following issues have been decided here.

1. First, the Act does not completely preempt state authority to regulate risk retention groups. Instead, the Act's tripartite scheme of state and federal regulation carefully carves out substantial areas for domiciliary and non-domiciliary states to exercise regulatory authority over risk retention groups.

2. Second, Virginia's Bureau of Insurance did not conduct an "examination" under the Act when it reviewed the results of CDI's examination of NHIC and other publicly available information. Further, after a determination that NHIC was financially unstable, the Act's preemptive scope did not preclude the Bureau of Insurance from seeking an injunction before the SCC, on the premise

---

**36.** The "flagrantly unconstitutional" abstention exception has been so narrowly construed as to be rendered "virtually meaningless." *Simopoulos v. Virginia State Bd. of Medicine*, 644 F.2d 321, 328 (4th Cir.1981) (holding that action for declaratory judgment and injunctive relief against enforcement of Virginia's anti-abortion statute was properly dismissed under *Younger* where plaintiff had adequate opportunity to raise constitutional claim in state court). NHIC does not facially challenge the constitutionality of ei-

ther the federal Risk Retention Act or the Virginia Act. And, as noted herein, the SCC acted within the parameters of the federal Risk Retention Act in electing to partially enjoin NHIC after determining that the company was financially unstable. Finally, NHIC's claim of federal preemption is not entitled to deferential treatment. *See NOPSI*, 491 U.S. at 365, 109 S.Ct. at 2516; *Olde Discount Corp. v. Tupman*, 1 F.3d 202, 213 (3rd Cir.1993).

that the SCC was a "court of competent jurisdiction."

3. Third, the SCC may function as a "state court of competent jurisdiction" within the meaning of the Act when it sits in its adjudicative capacity as a court of record, but not when it acts in its legislative capacity.

Not decided here, but left instead to the Supreme Court of Virginia, are at least the following issues.

1. First, whether the SCC, given the circumstances of this case, acted in its judicial capacity as a court of record.

2. Second, whether the SCC's Order was providently and properly issued given the record presented, the standards set forth in the Act and those principles of Virginia law not inconsistent with the Act.

Accordingly, plaintiff's action is **DISMISSED WITHOUT PREJUDICE.**