The INSURANCE COMPANY OF the STATE OF PENNSYLVANIA, Plaintiff–Appellant,

v.

James P. CORCORAN, Superintendent of Insurance of the State of New York, Defendant–Appellee.

No. 678, Docket 87–7858.

United States Court of Appeals, Second Circuit.

Argued April 5, 1988.

Decided June 22, 1988.

Edward P. Krugman, New York City (Patricia Dobberstein, Gary S. Hammersmith, Jeanne Lahiff (awaiting admission), Cahill Gordon & Reindel, New York City, of counsel), for plaintiff-appellant.

Hugh B. Weinberg, New York City (Robert Abrams, Atty. Gen. of the State of New York, Harvey M. Berman, Ann Horowitz, Asst. Attys. Gen., Martin Minkowitz, Deputy Superintendent and General Counsel of the Insurance Dept. of the State of New York, New York City, of counsel), for defendant-appellee.

Jon Harkavy, New York City (Theodore V.H. Mayer, John J. Sarchio, Steven W. Pelak, William R. Maguire, Hughes Hubbard & Reed, New York City, of counsel), for amicus curiae The Risk and Ins. Management Society, Inc.

Sandra L. Gilfillan, Kansas City, Mo., for amicus curiae National Ass'n of Ins. Com'rs.

Before LUMBARD, OAKES and WINTER, Circuit Judges.

WINTER, Circuit Judge:

The Product Liability Risk Retention Act of 1981 ("RRA"), as amended by the Liability Risk Retention Act of 1986, 15 U.S.C. §§ 3901–3906 (1982 & Supp. IV 1986), authorizes persons or businesses with similar or related liability exposure to form "purchasing groups" for the purpose of purchasing liability insurance on a group basis and "risk retention groups" for the purpose of self-insuring. 15 U.S.C. §§ 3901(a)(4) & (5). Because purchasing and risk retention groups are illegal under some states' laws, and state regulation or prohibition of such groups would otherwise be protected by the McCarron–Ferguson Act, 15 U.S.C. § 1012 (1982), the RRA contains express preemption provisions. This appeal raises the question of whether those provisions prohibit the application of all state policy-form and rate regulation to purchasing groups. Both the language and the legislative history of the RRA indicate that Congress did not intend to preempt all such regulation. We therefore affirm.

## BACKGROUND

We briefly trace the history of the RRA, which consists for pertinent purposes of two major pieces of legislation. In the mid–1970's, many businesses believed they faced a crisis in purchasing product liability insurance. Premiums had increased dramatically, and some companies appear to have been unable to obtain product liability coverage at any price. After four years of study, Congress enacted legislation in 1981 ("1981 Act"), 15 U.S.C. §§ 3901–3904 (1982), to reduce the cost and increase the availability of product liability insurance. In particular, the 1981 Act enabled insureds to purchase product liability insurance on a group basis through purchasing groups or to self-insure through insurance cooperatives called risk retention groups. S.Rep. No. 172, 97th Cong., 1st Sess. 1 (1981); *see also* H.R.Rep. No. 190, 97th Cong., 1st Sess. 4, *reprinted in* 1981 U.S. Code Cong. & Admin.News 1432, 1432 (same). Section 4 of the 1981 Act provided for the preemption of specific state regulatory measures regarding purchasing groups, *see infra* note 1, while Section 3 contained somewhat different preemption provisions regarding risk retention groups.

The 1981 Act applied only to product liability and completed operations insurance. Municipalities, professionals, and businesses soon complained that premiums for all kinds of liability insurance were skyrocketing and that coverage was frequently no longer available at any price. In response, Congress passed legislation in 1986 ("1986 Act") amending the 1981 Act so that it applied to all commercial liability insurance.

This case involves the Nurse Practitioners Professional Liability Purchasing Group. Nurse practitioners are registered nurses who have completed additional training and have been certified as nurse practitioners by the American Nurses' Association. The almost 30,000 nurse practitioners in the United States provide care at a level between traditional nursing services and physicians' care. Until 1987, the Interstate Indemnity Company was the only insurance carrier providing professional liability coverage to nurse practitioners. Interstate's policy provided $1,000,000 per occurrence/$3,000,000 aggregate annual loss coverage for a premium of $58 per year. In the spring of 1987, Interstate announced its intended withdrawal from the nurse-practitioner market. Thereafter, Interstate wrote no new policies and offered only one-year transitional coverage at an annual premium of $1,500, an increase of nearly 2500 percent.

After Interstate's announcement, plaintiff-appellant Insurance Company of the State of Pennsylvania ("State of Penn"), an insurer authorized to do business in New York, decided to offer such insurance on a nationwide basis to members of the Nurse Practitioners Professional Liability Purchasing Group, at rates considerably less than Interstate was charging. The rub that led to this litigation was that State of Penn planned to use a uniform nationwide policy form and to charge uniform nationwide rates on the assumption that the RRA preempted state policy-form and rate-approval regulation. However, the Superintendent of Insurance of the State of New York advised insurers writing or planning to write policies for purchasing groups in New York that the RRA did not relieve insurers of their obligation to comply with the policy-form and rate-approval requirements of Article 23 of the New York State Insurance Law, N.Y.Ins.Law §§ 2301–2342 (McKinney 1985 & Supp.1988).

State of Penn then filed an action for declaratory and injunctive relief in the Southern District and sought a preliminary injunction prohibiting the Superintendent from enforcing Article 23. After the parties agreed to treat the motion papers as cross-motions for summary judgment, Judge Keenan granted summary judgment for the Superintendent on the ground that the RRA does not entirely preempt the Superintendent's authority to require insurers of purchasing groups to comply with New York's policy-form and rate-approval laws.

## DISCUSSION

The pertinent provision of the RRA, Section 4(a)(2), exempts purchasing groups from:

> any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would—
>
> (2) make it unlawful for an insurer to provide or offer to provide insurance on a basis providing, to a purchasing group or its members, advantages, based on their loss and expense experience, not afforded to other persons with respect to rates, policy forms, coverages, or other matters; ...

15 U.S.C. § 3903(a)(2). State of Penn argues that Section 4(a)(2) should be read as preempting all state regulation that would impair the creation or operation of purchasing groups. Because state policy-form and rate regulation might raise the cost of insurance to purchasing groups and their members, frustrate purchasing groups' mass marketing plans, and subject purchasing groups to multiple and inconsistent state regulatory rules, State of Penn asserts that such regulation is preempted by Section 4(a)(2). We disagree.

Section 4(a)(2) expressly preempts only those state laws that prohibit insurers from offering purchasing groups *"advantages,*

*based on their loss and expense experience.*" (Emphasis added). It does not purport to prevent state regulators from rejecting a policy form differing from that used for non-members of a purchasing group or from rejecting a lower rate than is generally available to non-members if these differences are *not* "based on their loss and expense experience." On its face, therefore, Section 4(a)(2) does not preempt all state regulatory authority over policy forms and rates where purchasing groups are involved.

State of Penn also draws our attention to Section 6(a) of the 1986 Act, 15 U.S.C. § 3905(a), which states that "[n]othing in this chapter shall be construed to exempt a risk retention group or purchasing group . . . from the policy form or coverage requirements of any State motor vehicle no-fault or motor vehicle financial responsibility insurance law." It argues that under the principle of *expressio unius est exclusio alterius* its interpretation of Section 4(a)(2) is required because Section 6(a) "implies that the Act *does* exempt purchasing groups from state policy form and coverage requirements outside the motor vehicle area." Brief of Appellant at 19 (emphasis in original). Whatever strained implication might flow from reading Section 6(a) in isolation is convincingly dispelled by examining it in the context of Section 4(a), however. Under Section 4(a), *some* state policy-form and rate requirements may not apply to liability insurance sold to purchasing groups, a partial federal preemption; while under Section 6(a), *all* state policy-form and coverage requirements apply to motor vehicle no-fault and automobile financial responsibility insurance laws, an express rejection of federal preemption. No inconsistency thus occurs when the plain meaning of both sections is given effect. Indeed, in light of Section 4(a)'s express preemption of specific state laws,

application of the principle of *expressio unius est exclusio alterius* leads directly to the conclusion that state regulation not expressly mentioned in Section 4(a) remains in force.

The legislative history strongly supports the conclusion that Congress meant what it said in Section 4(a). Because purchasing groups and risk retention groups were illegal under many state laws, the 1981 Act explicitly addressed the relative role of state and federal regulation. Congress considered and then rejected the creation of a comprehensive federal regulatory scheme for purchasing and risk retention groups. *See* H.R.Rep. No. 190, 97th Cong., 1st Sess. 6–7, *reprinted in* 1981 U.S.Code Cong. & Admin.News at 1435; *see also Home Warranty Corp. v. Caldwell,* 777 F.2d 1455, 1471–72 (11th Cir.1985). Congress decided instead to include separate and distinct preemption schemes for purchasing groups and risk retention groups. These carefully drafted provisions were designed to provide a "workable legal framework" balancing the traditional authority of the states and the need for purchasing groups to ameliorate the liability insurance crisis. H.R.Rep. No. 563, 99th Cong., 1st Sess. 21, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5303, 5318.

Section 3(a)(1), the provision of the 1981 Act pertinent to risk retention groups, preempted "any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would . . . make unlawful, or regulate, directly or indirectly, the operation of a risk retention group. . . ." Further subparagraphs then carved out specific exceptions to this broad preemption. *See* 15 U.S.C. § 3902(a)(1)(A–G). The provision of the 1981 Act applicable to purchasing groups took the opposite approach and avoided sweeping preemption language in favor of designating specific categories of state law to be preempted.[1]

---

1. Section 4(a) preempts:

   any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would—
   
   (1) prohibit the establishment of a purchasing group;

   (2) make it unlawful for an insurer to provide or offer to provide insurance on a basis providing, to a purchasing group or its members, advantages, based on their loss and expense experience, not afforded to other persons with respect to rates, policy forms, coverages, or other matters;

State of Penn argues that the House and Senate Reports indicate that a wholesale preemptive effect was intended for purchasing groups. That argument is completely without merit. Introductory language in the 1981 House and Senate Reports did state in general terms that the purpose of Section 4(a) is "to preempt State laws which restrict or hinder the creation or operation of safety groups or other arrangements made to take advantage of the mass marketing programs of any insurance company...." H.R.Rep. No. 190, 97th Cong., 1st Sess. 19, *reprinted in* 1981 U.S. Code Cong. & Admin.News at 1448; S.Rep. No. 172, 97th Cong., 1st Sess. 17–18. However, the very next paragraph in both Reports states: "[t]he *specific* State laws, rules, regulations, and orders from which purchasing groups are exempted are set forth in paragraphs (1) through (9) of subsection (a)." H.R.Rep. No. 190, 97th Cong., 1st Sess. 19, *reprinted in* 1981 U.S.Code Cong. & Admin.News at 1448; S.Rep. No. 172, 97th Cong., 1st Sess. 18 (emphasis added). The Reports then describe Section 4(a)(2) as

provid[ing] an exemption from any State law which would make it unlawful for insurers to provide or offer insurance policies on a group basis to a purchasing group. This paragraph contemplates that a group might be offered advantages over the general public based upon its unique loss and/or loss expense experience, with the advantage taking the

(3) prohibit a purchasing group or its members from purchasing insurance on the group basis described in paragraph (2) of this subsection;

(4) prohibit a purchasing group from obtaining insurance on a group basis because the group has not been in existence for a minimum period of time or because any member has not belonged to the group for a minimum period of time;

(5) require that a purchasing group must have a minimum number of members, common ownership or affiliation, or a certain legal form;

(6) require that a certain percentage of a purchasing group must obtain insurance on a group basis;

(7) require that any insurance policy issued to a purchasing group or any members of the group be countersigned by an insurance agent or broker residing in that State; or

form of rate reductions, changes in policy forms, coverages, or other matters.

H.R.Rep. No. 190, 97th Cong., 1st Sess. 19, *reprinted in* 1981 U.S.Code Cong. & Admin.News at 1448; S.Rep. No. 172, 97th Cong., 1st Sess. 18. The House and Senate Reports for the 1981 Act thus solidly support the conclusion that only those state laws and regulations specifically designated in Section 4 are preempted.

Nothing in the language or history of the 1986 Act undermines this conclusion.[2] Apart from expanding the applicability of the 1981 Act to all forms of liability insurance, the 1986 Act made only minor changes. These changes did not alter the substantive preemption provisions applicable to purchasing and risk retention groups. As expressly noted by the House Report:

In enacting the 1981 Act, it was recognized that there were a number of identifiable kinds of State laws that prevented the establishment and functioning of purchasing groups. Those laws were listed in Section 4(a) of the 1981 Act and it is those laws that are preempted. Subject to the prohibition on discrimination against purchasing groups, the states remained able to apply all their other laws to purchasing groups and those dealing with such groups. This approach is carried forward into the 1986 Act. Therefore the Committee did not consider it

(8) otherwise discriminate against a purchasing group or any of its members.

15 U.S.C. § 3903(a).

2. State of Penn relies upon a remark by Senator Kasten, floor manager of the 1986 Act, that the 1986 amendments to the 1981 Act would "make it easier for [persons seeking insurance coverage beyond products liability] to form collective purchasing groups ... without imposing on them conflicting requirements in each state in which they operate." 132 Cong.Rec. S9229 (daily ed. July 17, 1986) (Statement of Sen. Kasten). Even if we assume that this statement means that liability insurance might be sold to purchasing groups with uniform nationwide policy forms and rates, this isolated statement does not accompany any provision in the 1986 Act even remotely associated with that purpose.

necessary to itemize all the other laws to which purchasing groups remain subject. H.R.Rep. No. 865, 99th Cong., 2d Sess. 19, *reprinted in* 1986 U.S.Code Cong. & Admin.News at 5316.

Our conclusion is thus supported by carefully drafted statutory language and a legislative history demonstrating virtually beyond cavil that Congress meant what it said. State of Penn may be correct that the RRA's preemption provisions are so narrow that Congress's general goal of increasing the availability of liability insurance to purchasing groups will be only partly achieved. Congress, however, selected particularized means to that end in conscious recognition that a considerable area of state regulation would remain intact. We have no power to second-guess Congress's decision that the benefits of an arguably more efficient market for insurance are outweighed by the potential costs in diminished state authority.

Affirmed.