PREFERRED PHYSICIANS MUTUAL RISK RETENTION GROUP and U.S. Physicians Mutual Risk Retention Group, Plaintiffs,

v.

Mario M. CUOMO, Governor of the State of New York, Salvatore R. Curiale, Superintendent of Insurance of the State of New York, Commissioner of Health of the State of New York, Physicians' Reciprocal Insurers, Medical Liability Mutual Insurance Company and Catholic Medical Center of Brooklyn & Queens, Inc., Defendants.

No. 91 Civ. 2733 (PKL).

United States District Court, S.D. New York.

Oct. 20, 1994.

Kurzman Karelsen & Frank, New York City (Phyllis H. Weisberg and David N. Mair, of counsel), for plaintiffs.

G. Oliver Koppell, Atty. Gen. of the State of New York, New York City (Frederic L. Lieberman and August L. Fietkau, of counsel), for defendants Cuomo, Curiale and Com'r of Health.

Leboeuf, Lamb, Greene & Macrae, New York City (Molly S. Boast, Margaret A. Keane and Michael Maya, of counsel), for defendant Medical Liability Mut. Ins. Co.

Kelly, Drye, & Warren, New York City (Steven Rogers, of counsel), for defendant Catholic Medical Center of Brooklyn & Queens, Inc.

Lewis Johs Avallone & Bruno, Melville, NY (Marcy Sheinwold, of counsel), for defendant Physicians' Reciprocal Insurers.

Olsson, Frank and Weeda, P.C., Washington, DC (Philip C. Olsson, of counsel), amicus curiae.

## *OPINION AND ORDER*

LEISURE, District Judge:

This is an action brought by Preferred Physicians Mutual Risk Retention Group ("PP") and U.S. Physicians Mutual Risk Retention Group ("USP") to enforce their right to do business in the State of New York, as provided in the Liability Risk Retention Act of 1986, 15 U.S.C. § 3901 *et seq.* ("LRRA"). Plaintiffs have moved this Court for an order, pursuant to Rules 15(a) and (b) of the Federal Rules of Civil Procedure, granting leave to plaintiffs to file an amended and supplemental complaint. Defendants respond, in opposition to plaintiffs' motion, with motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and a motion to dismiss pursuant to Rule 12(b)(6). Plaintiff PP, in turn, moves this Court for partial summary judgment. For the reasons stated below, plaintiffs' motion to file an amended complaint is granted, defendants' motions for summary judgment and to dismiss are denied, and plaintiff PP's motion for summary judgment is granted.

## BACKGROUND

Plaintiffs, PP and USP,[1] are two risk retention groups ("RRGs") organized under the laws of the State of Missouri and licensed to carry on the business of medical malpractice liability insurance in the State of New York, pursuant to the LRRA. Specifically, they are engaged in the business of providing medical malpractice insurance to anesthesiologists and orthopedic surgeons, respectively. "An RRG is a group of insureds who join together to form an insurance firm of which they are the owners. The insureds, with similar interests and risks, band together and pool their resources in furtherance of creating an acceptable and reasonable liability mechanism for themselves." Amicus Curiae Brief of The National Risk Retention Association ("Amicus Mem.") at 3.

Defendant Mario M. Cuomo ("Cuomo") is the Governor of the State of New York. Defendant Salvatore R. Curiale ("Curiale") is the Superintendent of Insurance of the State of New York. Another named individual defendant is the Commissioner of Health of the State of New York ("the Commissioner"). These three defendants will be referred to collectively as "the State defendants." Defendants Medical Liability Mutual Insurance Company ("MLMIC") and Physicians' Reciprocal Insurers ("PRI") are licensed New York insurers in competition with plaintiffs. Finally, defendant Catholic Medical Center

---

1. Both plaintiffs moved to amend the complaint, but plaintiffs' counsel subsequently advised the Court that plaintiff USP was in the process of being liquidated and that a motion would be made to drop USP from this action. This Court has received no such application. Consequently, although PP is the only plaintiff moving for sum- mary judgment, and in its later papers, plaintiffs' counsel solely refers to plaintiff PP, this Court will continue to treat both plaintiffs as seeking to file an amended complaint. When this Court refers to "plaintiff" in the singular, however, it refers to plaintiff PP.

of Brooklyn and Queens, Inc. is a New York not-for-profit corporation which owns and operates hospitals in Brooklyn and Queens, New York.

Plaintiffs commenced this action in April 1991 to enforce their right to do business in the State of New York, as provided in the LRRA. Plaintiffs' original complaint alleges, *inter alia:* (1) that New York's Excess Insurance Law, Section 18 of Chapter 266 of the Laws of 1986 of New York, as amended and extended (the "Excess Insurance Law") violates the LRRA and the Commerce Clause, Article I, Section 8 of the United States Constitution ("the Commerce Clause"), and enforcement of the Excess Insurance Law should be enjoined; (2) that attorneys' fees should be awarded, pursuant to 42 U.S.C. § 1983, for deprivation of constitutional rights secured by the Commerce Clause; (3) that certain violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1990), should be enjoined; and (4) that damages should be awarded for violations of the Sherman Act, New York's Donnelly Act (New York General Business Law § 340), and for interference with contracts with insureds.

On January 12, 1994, plaintiffs moved this Court for an order, pursuant to Rules 15(a) and 15(b) of the Federal Rules of Civil Procedure, granting to plaintiffs leave to file an amended and supplemental complaint. Plaintiffs seek to amend their claims in two respects. First, they seek to broaden their allegations within the existing causes of action and to widen their request for relief by seeking to enjoin conduct by the State defendants which allegedly interferes with plaintiffs' businesses. Second, plaintiffs seek to add claims against MLMIC and Curiale under section 1 of the Sherman Antitrust Act ("§ 1 of Sherman Act").

On May 4, 1994, in response to plaintiffs' motion to amend, State defendants moved for summary judgment on plaintiffs' first, second, third and fourth claims for relief, and moved for dismissal of plaintiffs' fifth claim for relief and its new ninth claim for relief. On that same day, defendant MLMIC made a motion to dismiss the ninth and tenth causes of action asserted in the Amended Complaint that plaintiffs proposed to submit upon a favorable ruling in their motion to amend. Finally, completing the tangled web of overlapping motions, plaintiff PP made a motion for partial summary judgment on May 4, 1994, requesting the Court to grant the relief it requested in its first, second, third and fourth causes of action.

## DISCUSSION

The plethora of motions in this case makes it difficult to choose the most efficacious point to begin analysis. The best way to proceed appears to be to address, in order, plaintiffs' causes of action with accompanying motions.

## I. Causes of Action 1–4

Plaintiffs' first four causes of action allege, in essence, that the Excess Insurance Law violates the LRRA and the Commerce Clause, that plaintiffs have no adequate remedy at law, and that the Excess Insurance Law should be enjoined. State defendants move for summary judgment with respect to these four causes of action, and plaintiff PP counters with its own motion for partial summary judgment asking the Court to decide these four causes of action in its favor.

### A. *Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). "In deciding whether to grant summary judgment all inferences drawn from the materials submitted to the trial court are viewed in a light most favorable to the party opposing the motion. The nonmovant's allegations are taken as true and it receives the benefit of the doubt

when its assertions conflict with those of the movant." *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Id.; accord Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.,* 477 U.S. at 249, 406 S.Ct. at 2511.

In the instant motions, there is no disputed element of fact. Rather, the matter turns on whether, as a matter of law, the LRRA preempts New York's Excess Insurance Law. Plaintiffs argue that it does and defendants contend that it does not. Before a determination can be reached, the history and language of the statutes in question must be carefully analyzed.

B. *The LRRA*

In 1981, in response to a perceived crisis in the availability and affordability of commercial product liability insurance, Congress enacted the Product Liability Risk Retention Act of 1981, 15 U.S.C. §§ 3901–3904 (1984) ("PLRRA"). State Defendants' Memorandum of Law in Support of their Motion ("State Defendants Mem.") at 2. The Risk Retention Amendments of 1986 (Pub.L. No. 99–563, 100 Stat. 3170–3172, 3177), effective October 27, 1986, created the law currently in place, the Liability Risk Retention Act. *Id.* at 2–3. "The LRRA was designed to eliminate state law barriers to the formation and operation of RRGS, yet reserve adequate state governmental oversight and regulation over these entities." Amicus Mem. at 7. In essence, the LRRA requires that RRGs be licensed in a single state but then permits them to operate in all other states without obtaining a separate insurance license in each state in which they do business. This is accomplished through the use of specific exemptions from state insurance regulation contained in the LRRA. State Defendants Mem. at 3. Consequently, states in which a RRG operates ("non-domiciliary" states), other than the state in which it is licensed ("domiciliary" state), are permitted to regulate the RRG only to the extent allowed under the LRRA.

The LRRA provides, in pertinent part, as follows:

(a) Except as provided in this section, a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation or order would—

(1) *make unlawful, or regulate, directly or indirectly, the operation of a risk retention group* except that the jurisdiction in which it is chartered may regulate the formation and operation of such a group and any State may require such a group to—

(A) comply with the unfair claim settlement practices law of the State;

(B) pay, on a nondiscriminatory basis, applicable premium and other taxes which are levied on admitted insurers and surplus lines insurers, brokers, or policyholders under the laws of the State;

(C) participate, on a nondiscriminatory basis, in any mechanism established or authorized under the law of the State for the equitable apportionment among insurers of liability insurance losses and expenses incurred on policies written through such mechanism;

(I) provide the following notice, in 10–point type, in any insurance policy issued by such group;

NOTICE

"This policy is issued by your risk retention group. Your risk retention group may not be subject to all of the insurance laws and regulations of your State. State insurance insolvency guaranty funds are not available for your risk retention group."

(2) require or permit a risk retention group to participate in any insurance insolvency guaranty association to which an

insurer licensed in the State is required to belong;

(4) *otherwise discriminate against a risk retention group or any of its members,* except that nothing in this section shall be construed to affect the applicability of State laws generally applicable to persons or corporations.

15 U.S.C. §§ 3903(a)(1)(E)–(I), (2), (4) (emphasis added).

## C. *The Excess Insurance Law*

"In response to the liability insurance crisis, many states enacted their own tort and insurance reform measures." State Defendants Mem. at 3. New York, in 1985, enacted reform legislation, Chapter 294 of the Laws of 1985.[2] Included in the 1985 legislation was a mechanism for providing excess medical malpractice insurance coverage to physicians and dentists affiliated with hospitals in New York. *Id.* at 4. Chapter 266 of the Laws of 1986 was enacted to continue and expand the 1985 reforms and became effective on July 8, 1986. *Id.* at 5. Section 18 of the 1986 Legislation, the Excess Insurance Law, established a new mechanism to finance excess insurance coverage to hospital-affiliated physicians. *Id.* It is this mechanism which plaintiffs assert is preempted by the LRRA. Chapter 256 of the Laws of New York of 1993, Section 5, is also referred to as the Excess Insurance Law because it is the current form of the section 18 mechanism. Section 5 provides, in pertinent part, as follows:

The superintendent of insurance and the commissioner of health or their designee shall, from funds available in the hospital excess liability pool ... purchase a policy or policies for excess insurance coverage ... or shall purchase equivalent excess coverage in a form previously approved by the superintendent of insurance ... or reimburse the hospital where the hospital purchases equivalent excess coverage ... for physicians or dentists certified as eligible for each such period or periods ... by a general hospital

licensed pursuant to article 28 of the public health law; and *provided, however, that such eligible physicians or dentists must have in force an individual policy from an insurer licensed in this state* of primary malpractice insurance coverage in amounts no less than one million dollars for each claimant and three million dollars for all claimants under that policy during the period of such excess coverage....

Chapter 256 of the Laws of New York of 1993, Section 5 (emphasis added).

■ Regulatory authority over the business of insurance remains with the individual states, limited only by the preemption provisions contained in federal statutes, including the LRRA. *See, e.g., Insurance Co. of Pennsylvania v. Corcoran,* 850 F.2d 88, 91 (2d Cir.1988); note 2 *supra.* The question before this Court is whether the specific exemption provisions of the LRRA preempt New York's Excess Insurance Law. It is apparent that the LRRA's statutory provision of federal preemption is not complete, nevertheless, for the following reasons, this Court finds that the LRRA does preempt the Excess Insurance Law.

## D. *15 U.S.C. § 3902(a)(1)*

■ Section 3902(a)(1) states that a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation or order would make unlawful, or regulate, directly or indirectly, the operation of a risk retention group. Plaintiffs argue that the Excess Insurance Law directly regulates the operation of risk retention groups, and the question clearly before the Court is whether it does so, either directly or indirectly.

State defendants argue that the Excess Insurance Law merely mandates that under specified conditions, general hospitals in the State must provide an excess layer of medical malpractice insurance coverage for their attending physicians and dentists. State De-

---

**2.** Insurance regulation has traditionally been left to the individual states. This is codified in the McCarran–Ferguson Act, 15 U.S.C. § 1012, which provides in § 1012(b), "No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for purpose of regulating the business of insurance ... unless such act specifically relates to the business of insurance ..."

fendants Mem. at 18. State defendants further contend that the statute does not expressly mention risk retention groups and therefore has no application to them. "Risk retention groups are not required to do anything, nor are they required to refrain from doing anything under [the LRRA]." *Id.* This Court finds State defendants' arguments unpersuasive.

It is clear that a statute can indirectly regulate an entity or a group of entities without ever explicitly mentioning them. The Excess Insurance Law, for example, although never alluding to RRGs, indirectly regulates them by providing a competitive advantage to their rivals. The Excess Insurance Law provides excess insurance coverage to physicians certified as eligible by a New York hospital ("eligible" physicians), but expressly limits this excess coverage to physicians who obtain their primary coverage through a New York licensed insurer. No RRG that writes medical malpractice insurance in New York is licensed in New York. *See* Plaintiffs' Memorandum of Law (i) in Further Support of its Motion for Leave to Amend and Supplement the Complaint; (ii) in Support of its Motion for partial Summary Judgment; and (iii) in Opposition to Defendants' Motions to Dismiss and for Summary Judgment (Plaintiffs' Opp.Mem.) at 10.

New York hospitals are required to contribute money to the Hospital Excess Liability Pool, which is used to fund the purchase of the excess coverage, seemingly regardless of the number of affiliated physicians and dentists who obtain their primary coverage through a New York licensed insurer. Hospitals are not charged based on the number of affiliated physicians eligible for the excess insurance coverage, nor do they pass on the costs of the excess insurance coverage specifically to eligible physicians. If eligible physicians are not required to pay for the excess insurance, then they, in effect, receive "free" insurance simply by obtaining their primary coverage through New York licensed insurers. In effect, the Excess Insurance Law provides excess liability insurance coverage for hospital-affiliated physicians at no cost to them, *providing* they receive their primary insurance from a New York licensed insurer.

As a consequence of a physician receiving free insurance contingent on his or her primary insurer being licensed in New York, insurance providers, in order to stay competitive, must receive New York accreditation. The result of such a mandate is to force non-domiciliary insurers to seek New York licenses or be excluded from the New York market. It follows that they must conform to all of New York's regulations.

In sum, by providing a competitive advantage to New York providers of malpractice insurance, New York offers a powerful incentive, bordering on a compulsion, to out-of-state RRGs to receive New York accreditation. This, in turn, requires these RRGs to conform to New York regulations. Non-domiciliary RRGs are thereby indirectly regulated by the Excess Insurance Law. New York regulates RRGs by exclusion, in effect, requiring a second licensure of RRGs by New York State. As will be elaborated further in the following section, it is exactly this type of compelled conformity to individual state requirements that the LRRA was enacted to eliminate.

In conformity with the relevant requirements of the McCarran Ferguson Act, section 3902(a)(1) of the LRRA establishes a broad range within which State law is preempted, but it also affords a narrow category of State action that is not preempted by the LRRA. *See* 15 U.S.C. 3902(a)(1)(A)–(I); *Insurance Co. of Pennsylvania,* 850 F.2d at 91. Defendants do not argue that the Excess Insurance Law falls within one of the established exceptions, contending only that the Law does not constitute either direct or indirect regulation of RRGs. This Court, therefore, merely notes that the Excess Insurance Law does not, in fact, fall within any of the provided preemption exceptions.

### E. *15 U.S.C. 3902(a)(4)*

■ Section 3902(a)(4) states that a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation or order would otherwise discriminate against a risk retention group or any of its members. The LRRA's "structure and language make clear that the 'express preemption of state law

with respect to risk retention groups is expansive.'" *National Home Insurance Co. v. State Corp. Comm'n.*, 838 F.Supp. 1104, 1109 (E.D.Va 1993) (citations omitted). The Court finds that, for the same reasons that New York's Excess Insurance Law constitutes indirect regulation of RRGs in violation of the LRRA, it also unfairly discriminates in breach of section 3902(a)(4).

On its face, the Excess Insurance Law discriminates against RRGs. In fact, as State defendants admit, "the Excess Insurance Law may indeed place plaintiff—and all other non-licensed medical malpractice insurers—at a competitive disadvantage...." State Defendants' Memorandum of Law in Reply and in Opposition ("State Defendants Reply") at 4. It provides free excess insurance coverage only to physicians who obtain their primary coverage through a New York insurer. The Excess Insurance Law discriminates against RRGs offering primary liability insurance to hospital-affiliated physicians by prohibiting excess liability coverage to RRG insureds. As a result, RRGs must charge their insureds rates lower than those offered by their New York licensed rivals or they must provide excess insurance coverage at their own expense.

State defendants argue that to interpret 3902(a)(4) as plaintiffs propose would preempt all state statutes that make any distinction whatsoever between RRGs and other entities. State defendants support this contention by referring to the provisions of the LRRA which expressly allow state regulation of RRGs in certain specified circumstances. For example, 3902(a)(2) permits states to require RRGs to participate in any insurance insolvency guaranty association to which an insurer licensed in the state is required to belong and 3902(a)(1)(I) authorizes states to require RRGs to provide notice of their status as unlicensed by the state and the resulting extra risk to insureds. State defendants further argue that discrimination is not prohibited by the LRRA, but only *unfair or unreasonable* discrimination. State defendants conclude that 3902(a)(4) was not intended to prevent states from making reasonable distinctions between RRGs and New York licensed insurers.

█ This Court finds State defendants' arguments unavailing. The LRRA provides for broad preemption of state laws and then supplies specific exceptions to that preemption. The Excess Insurance Law does not fall within one of those exceptions, and this Court will not infer from the fact that Congress provided narrow exceptions, that laws not within those exceptions, such as the Excess Insurance Law, were also not intended to be preempted. Although Congress permitted some state regulation of RRGs, it was quite specific about where such regulation was allowed, and it nowhere provided for discriminatory regulation such as New York's Excess Insurance Law. Furthermore, to interpret 3902(a)(4) as plaintiffs propose would not preempt all state statutes that distinguish between RRGs and domiciliary insurers, but it would preempt only those that do so in a manner in which the LRRA preemption provision was designed to prevent.

This Court's finding is buttressed by Congress' stated purpose in enacting the LRRA, which was to broaden and strengthen the PRRA, and to prevent states from imposing restrictions prohibiting the legitimate formation and operation of RRGs. *See* Cong.Rec., October 6, 1986, S. 15451. As one court has observed, "the Act's legislative history ... notes that preemption of state laws that inhibit the formation and continued operation of risk retention groups is 'central' to the Risk Retention Act's objective of facilitating the development of risk retention groups." *National Home Insurance*, 838 F.Supp. at 1109. "[T]he purpose of [the LRRA] is to broaden and strengthen the Risk Retention Act[,] ... existing laws which are only intended to prohibit, or which unjustifiably prohibit, the operation of a risk retention group would not be authorized. Such action would be contrary to the plain meaning and intent of this provision." Cong.Rec., October 6, 1986, S. 29090. In sum, the expressed objective of the LRRA is to facilitate the formation and operation of RRGs, and it does this by preempting the laws of individual states which impede the ability of RRGs to operate.

█ The LRRA preempts state laws which obstruct the ability of RRGs to operate

on a multi-state basis when licensed only in one state. *Charter Risk Retention Group Ins. Co. v. Rolka,* 796 F.Supp. 154, 157 (M.D.Pa.1992). The Excess Insurance Law is a state law which creates exactly such an obstruction. Consequently, the Excess Insurance Law directly contravenes the expressed objective of the LRRA, to allow RRGs access to all fifty states unencumbered by onerous individual state licensing requirements.

### F. *15 U.S.C. 3905(d)*

State defendants argue that further evidence that Congress did not intend to preempt laws such as the Excess Insurance Law can be found in Congress' treatment of state-imposed financial responsibility requirements. Section 3905(d) of the LRRA provides as follows:

> (d) Subject to the provisions of section 3902(a)(4) of this title relating to discrimination, nothing in this chapter shall be construed to preempt the authority of a State to specify acceptable means of demonstrating financial responsibility where the State has required a demonstration of financial responsibility as a condition for obtaining a license or permit to undertake specified activities. Such means may include or exclude insurance coverage obtained from an admitted insurance company, a risk retention group, or any other source regardless of whether coverage directly from an insurance company or through a broker, agent, purchasing group, or any other person.

15 U.S.C. 3905(d).

State defendants argue that, "while the Excess Insurance Law is not a financial responsibility statute in the strict sense, we believe the State interests in mandating that the attending physicians' primary coverage be of specified limits, and underwritten by a licensed insurer, are directly analogous to the concerns involved in imposing minimum financial responsibility requirements." State Defendants Mem. at 25. Preliminarily, this Court notes that although the LRRA was not intended to preempt state regulatory schemes that require proof of financial responsibility, a state's authority to impose or apply financial responsibility requirements does not permit it to confer free excess insurance solely on state licensed insurers to the exclusion of financially sound RRGs. The Excess Insurance Law simply is not a state regulatory scheme designed to promote or guarantee financial responsibility among those issuing malpractice insurance within the State of New York.

In addition, a state's authority to impose or apply financial responsibility requirements is itself subject to the general LRRA statutory prohibition against state imposition of discriminatory requirements on RRGs. *See* Cong.Rec., October 6, 1986, S 15451;[3] *Charter Risk,* 796 F.Supp. at 157–58

---

**3.** State defendants point to a statement made by Senator Gorton as proof that the intent of those who enacted the LRRA was not to preempt laws such as the Excess Insurance Law. Senator Gorton said, "In the State of Washington, for instance, many activities require prior proof of insurance by a carrier admitted to do business in the State. Such laws would continue to be valid notwithstanding the fact that they might preclude participation in an out-of-State risk retention group for the purpose of meeting that requirement." Cong.Rec., October 6, 1986, S 15453–54.

The laws to which the Senator refers are ones that require physicians to have insurance by a carrier *admitted to do business in the state* before undertaking certain activities. The express purpose of the LRRA, however, was to require states to admit non-domiciliary RRGs to do business in the state. Therefore, the RRGs whose participation might be precluded by the laws to which Senator Gorton refers, are not all non-domicili-

ary RRGs, but only those that can not conform to a state's nondiscriminatory financial requirements. Senator Gorton is speaking about the language in the LRRA that permits states to impose financial responsibility requirements even though those requirements might prevent certain financially unsound RRGs from underwriting insurance in certain states. The Senator is not, however, as State defendants contend, stating that the LRRA allows states to enact laws that require proof of insurance from a domiciliary insurer even though such laws would preclude all RRG participation.

In sum, Senator Gorton was only trying to say that a state could enact nondiscriminatory financial responsibility requirements that were imposed equally on domiciliary and non-domiciliary insurance providers even though such requirements had the effect of precluding certain RRGs from providing insurance for certain activities in the state.

(§ 3905(d) allows states to demand a demonstration of financial responsibility and to exclude particular RRGs that fail to make an adequate showing, but not simply to exclude RRGs, in general); *but cf. Mears Transportation Group, Inc. v. Dickinson,* 34 F.3d 1013 (11th Cir.1994).[4] Although a state can impose financial responsibility requirements on RRGs as well as domiciliary insurers, it may not make unfair distinctions between the two groups. This Court finds that New York may not discriminate, in general, against RRGs, as it does in the Excess Insurance Law, but may only exclude RRG insurance policies on the basis of criteria which apply equally to domiciliary and non-domiciliary insurers.

Congress was cognizant of the fact that the ability of States to impose financial responsibility requirements might be misused by a state hostile to RRGs, and the legislative history of the LRRA makes clear that the imposition of discriminatory requirements intended to thwart the operation of RRGs is contrary to the intent of the LRRA.

H.R.Rep. No. 865, 99th Cong., 2nd Sess.1986, 1986 U.S.Code Cong. & Ad.News 5303–5306. Therefore, even if New York's Excess Insurance Law were somehow analogous to a financial responsibility requirement, it would still be preempted by the LRRA because, as elaborated before, it does make such unfair distinctions.

## G. Exemption

█ This Court, having found both that New York's Excess Insurance Law unfairly discriminates against RRGs and that it is preempted by the LRRA, must now determine whether the relief that plaintiffs request should be granted. This Court notes that plaintiffs have no adequate remedy at law nor do State defendants argue that they do. State defendants do correctly indicate that the actual preemptive language used in section 3902(a) provides only that a risk retention group is "exempt" from any state law, rule, regulation or order which would otherwise discriminate against a RRG or any of its members. State Defendants Mem. at

4. As plaintiffs assert and State defendants acknowledge, both *Charter* and *Mears Transportation Group, Inc. v. Dickinson,* Case No. 92–632–CIV–ORL–22 (M.D.Fla. Dec. 30, 1992) held that risk retention groups, as a class, cannot be excluded from providing coverage under state automobile financial responsibility statutes. State Defendants Mem. at 25 n. 6. However, during the pendency of the current motion, the Eleventh Circuit overruled the holding of the District Court in *Mears,* and found that Florida could exclude RRGs, as a class, as financially irresponsible. Both the dissent in the Eleventh Circuit and this Court disagree with the holding in that case.

The Eleventh Circuit found that the District Court's opinion was inconsistent with settled principles of statutory construction because the District Court's holding rendered certain sections of the LRRA superfluous. The opinion of the Eleventh Circuit, however, did not give proper weight to the numerous references contained within the LRRA, including within 3905(d) itself, to the prevention of discrimination nor to the clear purpose, illustrated by abundant documentary support, of the LRRA to foster the spread of RRGs unhampered by individual state regulatory requirements. Instead, the Eleventh Circuit found that Florida could simply determine that RRGs, as a class, are not financially responsible and therefore owners and operators of for-hire transportation vehicles cannot obtain insurance through them. A proper interpretation of 3905(d) is that it permits states to enact sweeping

financial responsibility requirements that have the effect of excluding certain RRGs, or even all RRGs, but that such sweeping requirements cannot be discriminatory.

This Court further notes that the situation in *Mears* is different from the matter currently before this Court. First, New York's Excess Insurance Law is not a financial responsibility statute. Second, the purported intent of the statute at issue in *Mears* was to safeguard passengers in for-hire vehicles by requiring that owners and operators obtain insurance from the "more financially responsible" Florida-licensed insurers. Owners and operators of for-hire vehicles were required to receive a certain amount of initial primary insurance from Florida insurers but could then receive additional insurance without restraint. The Excess Insurance Law, however, has exactly the opposite effect. It provides free additional excess insurance to physicians who receive their primary coverage from a New York licensed insurer and not to those who receive primary coverage through RRGs. The rationale of the law cannot be to protect physicians and their patients from irresponsible insurers because physicians are permitted to continue to obtain primary coverage from the RRGs. They are only denied the free excess coverage. It would be perverse for New York to "protect" its physicians by guaranteeing that those insured by "unsound" RRGs cannot obtain the additional insurance available to those already insured by "sound" New York insurers.

19. State defendants then argue that the Excess Insurance Law does not require RRGs to take or refrain from taking any action, and therefore, exempting RRGs from the law would have no effect.

State defendants' interpretation of the language of the LRRA would eviscerate the intended effect of the preemption provision. As State defendants would have it, states could provide discriminatory advantages to domiciliary insurers without any possibility of meaningful preemption. The proper construction of § 3902(a) is that RRGs are exempt, not just from the offending state statute, but from the discriminatory effect which results. In other words, the relief appropriate under the preemption provision of the LRRA is nullification of the discriminatory impact of the Excess Insurance Law.

Accordingly, this Court declares that non-New York domiciliary RRGs and their members are exempt from the requirement that primary insurance be from a New York licensed insurer. State defendants are hereby prohibited from enforcing Section 5 of Chapter 256 of the Laws of New York of 1993 as amended and extended, the Excess Insurance Law, in a manner which treats RRGs differently from licensed insurers. In sum, to be eligible for excess insurance coverage, physicians and dentists need not have in force an individual policy of primary malpractice insurance coverage "from an insurer licensed in New York."

### H. *Commerce Clause*

■ In their third cause of action, plaintiffs assert that the Excess Insurance Law and the regulations promulgated thereunder violate the Commerce Clause. State defendants argue that "[a]s a result of the *McCarran–Ferguson Act*, §§ 1 *et seq.*, 2, 15 U.S.C. §§ 1011 *et seq.*, 1012, the states are given the exclusive authority to regulate the business of insurance, in the absence of federal preemption arising from action by Congress in a particular area.... State law ... not otherwise specifically preempted ... [is] not sub-

ject to challenge under the Commerce Clause, as a matter of law." State Defendants Mem. at 29. While this statement is correct, it is unavailing in the present situation because this Court has found federal preemption of the Excess Insurance Law, arising from specific action of Congress. Consequently, the specifically preempted New York Excess Insurance Law is subject to challenge under the Commerce Clause.

This Court finds, for the reasons elaborated above, that New York's Excess Insurance Law discriminates against out-of-state malpractice insurance providers, and as a consequence, it imposes an unreasonable burden on interstate commerce in violation of the Commerce Clause.

### I. *Conclusion*

Having found that the Excess Insurance Law indirectly regulates RRGs, discriminates against RRGs in violation of the LRRA, and violates the Commerce Clause, the Court grants plaintiff PP's motion for partial summary judgment with respect to its first four causes of action and denies State defendants' motion for summary judgment with respect to these four causes of action.

### II. Causes of Action 5, 9, and 10

Plaintiffs' fifth cause of action alleges that State defendants, acting under color of law, have engaged in activities in violation of plaintiffs' rights under the Commerce Clause and the LRRA. Plaintiffs' ninth and tenth causes of action, asserted in the proposed Amended Complaint dated December 22, 1993, allege a conspiracy between defendant MLMIC and defendant Curiale to protect MLMIC's market share and foreclose plaintiffs from the New York medical malpractice liability insurance market in violation of § 1 of Sherman Act.[5] State defendants have moved to dismiss plaintiffs' fifth and ninth causes of action, and defendant MLMIC has similarly moved to dismiss plaintiffs' ninth and tenth causes of action.

---

**5.** Plaintiffs' ninth cause of action is directed at both Curiale and MLMIC and alleges a violation of 15 U.S.C. § 1. The tenth cause of action, directed at MLMIC only, is a claim under 15

U.S.C. § 15 for damages suffered as a result of the alleged conspiracy between Curiale and MLMIC.

## A. Court Consideration of Motion

As an initial matter, plaintiff PP accurately notes that defendants, rather than filing a traditional response in opposition to plaintiffs' arguments in support of their motion to amend, filed their own motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Defendants seek to dismiss the very same causes of action which plaintiffs attempt to add in their proposed amendment. Plaintiff PP argues that defendants are seeking to dismiss causes of action which have not yet been asserted.

Plaintiff asserts that defendants have likely made the motions in an attempt to obtain the right to reply on the antitrust issues and urges the Court to rule that the Rule 12(b)(6) motions are jurisdictionally defective. Plaintiff PP requests that the Court consider defendants' arguments simply as opposition to plaintiffs' motion to amend and not permit defendants to submit any further papers on the sufficiency of the antitrust claims. In the alternative, plaintiff requests permission to submit a further set of papers.

This Court, having allowed plaintiff PP to submit an additional set of papers, has considered all papers submitted in reaching its decision. Moreover, this Court observes that PP further submitted its own motion for summary judgment and an *amicus curiae* memorandum on PP's behalf was also accepted. The Court notes that, as its decision illustrates, plaintiff was in no way disadvantaged by the posture in which relevant issues were presented to the Court.

## B. Standard for Leave to Amend

Federal Rule of Civil Procedure 15(a) permits a party to amend a pleading by leave of the court, and directs that "leave shall be freely granted when justice so requires." The Second Circuit has interpreted Rule 15 to permit denial of a motion to amend "only for such reasons as 'undue delay, bad faith,

futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.' " *Richardson Greenshields Sec., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir 1987) (quoting *State Teachers Retirement Bd v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981)); *Tokio Marine and Fire Ins. Co. v. Employers Ins. of Wausau,* 786 F.2d 101, 103 (2d Cir.1986). "[A] court should deny leave to amend a pleading on grounds of futility only when the proposed amendment is clearly frivolous or advances a claim that is legally insufficient on its face." *Cashman v. Montefiore Medical Center,* 1993 WL 227700, at *2 (S.D.N.Y. June 21, 1993) (PKL).

Federal Rule of Civil Procedure 15(b) permits supplemental pleadings to include additional events occurring after the date of the original pleading. The same standards apply to Rule 15(b) motions as apply to Rule 15(a) motions. *Novak v. National Broadcasting Co.,* 724 F.Supp. 141 (S.D.N.Y.1989).

As was noted above, defendants responded to plaintiffs' motion to amend with their own motions to dismiss. State defendants profess that their motion to dismiss is "premised on the expectation that plaintiffs' motion to supplement and amend the complaint will be granted." State Defendants Mem. at 10 n. 3. Accordingly, this Court finds that State defendants have waived any objection to plaintiffs' amending their complaint.[6]

Defendant MLMIC, responded with a three page opposition to plaintiffs' motion to amend which referred the Court to its far longer Memorandum of Law in Support of its Motion to Dismiss the New Causes of Action ("MLMIC Mem."). In its three page opposition, MLMIC argues only that plaintiffs' theory is meritless, thereby rendering their proposed amendment futile.

Defendants argue in their respective motion papers that plaintiffs' motion to amend is without merit and therefore futile. Defen-

---

**6.** Interestingly, as defendant MLMIC indicates, when considering whether a proposed amendment is futile, the Court must conduct an inquiry comparable to the analysis governing a motion to dismiss under Rule 12(b)(6). *Arbitron Co. v. Tropicana Prod. Sales, Inc.,* No. 91 Civ. 3697 (PKL), 1993 WL 138965, at *3 (S.D.N.Y. April 28, 1993).

*See* MLMIC's Memorandum of Law in Opposition to Plaintiff's Motion for Leave to Amend and Supplement their Complaint. Yet, as was noted, State defendants have assumed that plaintiffs will be granted leave to amend, while simultaneously making a motion to dismiss.

dants do not object, nor could they successfully object, to plaintiffs' motion, on the grounds of undue delay, bad faith, or resulting prejudice to themselves. Consequently, this Court bases its decision on whether to grant leave to plaintiffs to amend and supplement their complaint solely on the issue of whether the proposed amendments would be futile due to a failure to state a claim upon which relief may be granted, the same standard the Court uses in deciding defendants' motions to dismiss.

## C. *Standard for Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of an action where a plaintiff has failed to state a claim upon which relief may be granted. In reviewing a motion to dismiss, a court must assume the facts alleged by the plaintiff to be true and must liberally construe them in the light most favorable to the plaintiff. *Easton v. Sundram,* 947 F.2d 1011, 1014 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). Therefore, "the court should not dismiss the complaint for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991) (*quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). "[T]he court's task on a Rule 12(b)(6) motion is not to rule on the merits of plaintiffs' claims, but to decide whether, presuming all factual allegations of the complaint to be true, and drawing all reasonable inferences in the plaintiff's favor, the plaintiff could prove any set of facts which would entitle him to relief." *Weiss v. Wittcoff,* 966 F.2d 109, 112 (2d Cir.1992) (citations omitted).

## D. *State Action Immunity*

 Defendants first assert that Curiale and MLMIC are immune from antitrust liability as a matter of law under the state action doctrine, and consequently plaintiffs have not stated a claim upon which relief may be granted. The state action doctrine is a judicially created canon to immunize from antitrust liability certain conduct by state or local governments as well as private parties acting in accordance with a governmental program. The Sherman Act does not apply to anticompetitive restraints imposed by states as an act of government. *See Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

### 1. *Ipso Facto Immunity*

 Ipso Facto immunity is available when the activity at issue is a direct action of the state. "[W]hen a state legislature adopts legislation, its actions constitute those of the State ... and ipso facto are exempt from the operation of the [federal] antitrust laws." *Hoover v. Ronwin,* 466 U.S. 558, 567–68, 104 S.Ct. 1989, 1995, 80 L.Ed.2d 590 (1984). Moreover, "where the action complained of ... was that of the State itself, the action is exempt from antitrust liability regardless of the State's motives in taking the action." *Id.* at 579–80, 104 S.Ct. at 2001. The relevant question, therefore, is whether the actions allegedly taken by Curiale constitute actions of the state.

 Curiale argues that, as an executive agency of the State of New York, the acts of the New York Department of Insurance (the "Department") are those of the sovereign and consequently are immune, irrespective of whether the Department's particular actions or their anticompetitive effects were specifically contemplated by the New York Legislature. Section 201 of New York's Insurance Law provides in relevant part, "The superintendent shall possess the rights, powers, and duties, in connection with the business of insurance in this state, expressed or reasonably implied by this chapter or any other applicable law of this state." N.Y.Ins.Law § 201 (McKinney 1985). The superintendent and the Department have broad authority to regulate the business of insurance.

This Court observes that the Supreme Court has not directly addressed the issue of what standard should be applied to claims of immunity by executive department officials, but it has held that "[c]loser analysis is required when the activity at issue is not directly that of the legislature or supreme court, but is carried out by others pursuant

to state authorization." *Hoover,* 466 U.S. at 568, 104 S.Ct. at 1995. Since executive department officials are not the legislature, the supreme court, nor even the Governor, they appear to be among the "others" referred to by the United States Supreme Court who act "pursuant to state authorization" and whose actions therefore require "closer analysis." *Hoover* at 567–68, 104 S.Ct. at 1994–95. It does not appear that the Second Circuit has considered directly the parameters of state executive department immunity, but it has found "[w]hen a state agency, municipality, or other state subdivision claims a state immunity from federal law, it must first identify a 'clearly expressed state policy' that authorizes its actions." *Cine 42nd St. Theater Corp. v. Nederlander Org., Inc.,* 790 F.2d 1032, 1043 (2d Cir.1986) (citations omitted). Consequently, this Court infers from relevant Supreme Court decisions that actions by executive department officials are not necessarily actions of the state entitled to ipso facto immunity. Instead, a closer examination of such actions is required to determine whether or not they warrant immunity. Moreover, even if the Department, when acting within its constitutional and statutory authority, is deemed to be acting as a sovereign, it is a question of fact in this case as to whether the Department was acting within its constitutional and statutory authority.

### 2. *"Clearly Articulated Policy" Standard for Immunity*

The "closer analysis" required is a showing that the anticompetitive activities are authorized by a "clearly articulated and affirmatively expressed" state policy and that "the legislature contemplated the kind of action complained of." *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 44, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985); *cf. Cine 42nd St. Theater Corp.,* 790 F.2d at 1043 (state agency's claim of immunity must be considered under the clearly articulated policy standard). Even if the standard were looser, due to the posture in which this question comes before this Court, it is unnecessary to carry out a detailed inquiry into the intricacies of what precisely the New York Legislature envisioned.

In a motion to dismiss, as was explained previously, the court's task is not to rule on the merits of plaintiffs' claims, but to decide whether, presuming all factual allegations of the complaint to be true, and drawing all reasonable inferences in the plaintiff's favor, the plaintiff could prove any set of facts which would entitle him to relief. In this case, plaintiffs allege actions, taken by defendants, that clearly fall outside the realm that the New York State Legislature authorized, envisioned, or condoned. Plaintiffs allege that Curiale committed more than a mere error of law, fact, or judgment. Although plaintiffs may have substantial difficulty supporting their allegations, in the current posture of this case, this Court need only consider whether any set of facts would sufficiently state a claim.

Plaintiffs allege that Curiale and MLMIC undertook a deliberate campaign of misinformation, that they actively sought to preclude RRGs from doing business in New York State, and that they otherwise conspired to interfere with the business of RRGs and engaged in discriminatory conduct. This Court finds that if plaintiffs' allegations concerning the conduct of Curiale and MLMIC are true, then defendants' activities were not authorized by a clearly articulated and affirmatively expressed state policy nor were they contemplated by the New York Legislature. Consequently, defendants would not be immune and plaintiffs' amended complaint would not be futile. The question of whether defendants have acted beyond the scope of their authority is one of fact, but plaintiffs have sufficiently alleged that such unauthorized actions took place to mandate the denial of defendants' motion to dismiss.

In addition, defendants' arguments concerning the extent of the Department's delegated authority is unavailing. Although the Department may have expansive power to regulate the business of insurance in New York, it does not have the power to engage in the activities in which it is alleged to have participated. This Court is unconvinced by defendant MLMIC's contention that, because the Department could remove financially impaired insurers from the market altogether, that it necessarily had the lesser ability to

interfere with plaintiffs' conduct of insurance business in New York. It is well established that the power to destroy does not encompass the "lesser" power of destroying in a discriminatory way for discriminatory reasons.

This Court need only add that because plaintiffs have stated a cause of action against the Department, defendant MLMIC's argument for automatic dismissal due to the impossibility of being a "sole conspirator" is unavailing.

### E. *Noerr–Pennington Doctrine*

Defendants also contend that the *Noerr–Pennington* doctrine immunizes the alleged conspirators from antitrust liability. Defendants preliminarily contend that the activity alleged in the new causes of action never resulted in a restraint of trade and that plaintiffs' were not adversely affected because they were not foreclosed from the market. This Court observes that plaintiffs adequately allege a restraint of trade and that the question of whether there was, in fact, a restraint of trade is a question inappropriate for the Court to consider on a motion to dismiss when all questions of fact are presumed in favor of the plaintiffs.

■■■ Plaintiffs' allege that MLMIC and the Department unlawfully urged the National Association of Insurance Commissioners ("NAIC") to adopt certain industry-wide standards. Amended Complaint ¶ 85(d). Defendants assert that, even taking these allegations as true, plaintiffs allege only conduct that is immune from antitrust liability under *Noerr–Pennington.* Under *Noerr–Pennington,* concerted efforts to restrain or monopolize trade by petitioning government officials are immune from liability under the antitrust laws. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Efforts to influence public officials are not illegal even if they are part of a scheme that violates the Sherman Act. *Pennington,* 381 U.S. at 670, 85 S.Ct. at 1593. The doctrine applies to lobbying efforts directed towards the decision-making

processes of executive, legislative, judicial, and administrative entities. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Pennington,* 381 U.S. 657, 85 S.Ct. 1585; *Noerr,* 365 U.S. 127, 81 S.Ct. 523.

■■ Defendants contend that the alleged concerted approach to the NAIC by MLMIC and the Department constitutes protected petitioning under the *Noerr–Pennington* doctrine. Defendants, however, limit their analysis to the NAIC activity without considering the other activities alleged by plaintiffs in their ninth and tenth causes of action. As to these other alleged activities, *Noerr–Pennington* immunity clearly does not apply.

Additionally, as to the actions that plaintiffs' allege MLMIC and Curiale engaged in to influence the NAIC, *Noerr–Pennington* immunity also does not apply because the NAIC is not a governmental body. It is a private trade association composed of government regulators from different states, and *Noerr–Pennington* immunity does not apply to such private associations. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). Finally, the actions in which defendants are alleged to have engaged appear to constitute more than simple petitioning or lobbying and so *Noerr–Pennington* immunity does not apply. The extent to which defendants actually engaged in the alleged actions, if at all, is not before this Court on the present motion, but such a finding will greatly assist future decisions concerning *Noerr–Pennington* immunity.

### F. *Anticompetitive Agreement*

■■ Defendant MLMIC's final argument is that, even absent a finding of immunity, dismissal is warranted because the allegations of the amended complaint do not allege facts sufficient to establish an anticompetitive agreement and cannot support an inference of one. Section 1 of the Sherman Act condemns "contract[s], combination[s] ... or conspirac[ies], in restraint of trade...." 15 U.S.C. § 1 (1990). A party must plead con-

certed action and a restraint on trade that injures competition.

This Court observes that the pleading standard for antitrust claims is quite permissive. *See George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 (2d Cir.1977) (a short, plain statement of a claim for relief which gives notice to the other party is all that is necessary). Plaintiffs have to do little more than give notice of the claim for relief for which they are asking. This Court cannot conclude that it is beyond doubt that plaintiffs can prove no set of facts in support of their claim which will entitle them to relief. Moreover, "dismissals on the pleadings are especially disfavored in antitrust cases." *Schwartz v. Jamesway Corp.,* 660 F.Supp. 138, 141 (E.D.N.Y.1987) (citing *Hospital Bldg. Co. v. Rex Hosp. Trustees,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976).

### G. *The Fifth Cause of Action*

Plaintiffs' fifth cause of action alleges that State defendants and others, operating under the color of law, deprived plaintiffs of their rights, privileges, and immunities secured by the Commerce Clause and the LRRA. State defendants move to dismiss plaintiffs' fifth cause of action based on their argument that the Excess Insurance Law was not preempted by the LRRA and so cannot constitute a violation of the Commerce clause. As indicated earlier, this Court rejects State defendants' argument, and consequently denies their motion to dismiss the fifth cause of action.

### H. *Conclusion*

This Court concludes that plaintiffs have adequately stated a claim for relief in their ninth and tenth causes of action and that defendants' claimed immunity does not foreclose plaintiffs' claims. This Court notes, however, that as the facts of this case are decided, it may become apparent that the actions actually taken by defendants were protected by either the state action immunity doctrine or the *Noerr–Pennington* immunity doctrine.

### CONCLUSION

For the reasons set forth above, this Court grants leave to plaintiffs to amend their complaint. This Court further grants partial summary judgment to plaintiffs with respect to their first, second, third and fourth causes of action. Accordingly, State defendants are prohibited from enforcing Section 5 of Chapter 256 of the Laws of New York of 1993, as amended and extended, the Excess Insurance Law, in a manner which treats RRGs differently from licensed insurers until a more permanent injunction is entered. Plaintiffs are directed to furnish the Court and defendants with a proposed permanent injunction within 20 days from the date of this Order. Lastly, State defendants' and MLMIC's motions for summary judgment are denied.

SO ORDERED.